LAWLOR et al. v. LOEWE et al.

(Circuit Court of Appeals, Second Circuit.    December 18, 1913.)

No. 32.

**1. MONOPOLIES (§ 14*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE —BOYCOTT—TRADE UNIONS.**

Where members of a labor union attempted to compel a hat manufac turer to unionize his factory, left his employment, and prevented others from taking employment therein, and with the assistance of members of affiliated organizations declared a boycott on his goods in other states into which the goods had been shipped for sale at retail, such acts con stituted a combination or conspiracy in restraint of interstate commerce, in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 207 (U. S. Comp. St. 1901, p. 3200), for which the manufacturer was entitled to recover treble damages under section 7.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 11; Dec. Dig. § 14.*]

**2. CONSPIRACY (§ 1*)—WHAT CONSTITUTES.**

A "conspiracy" is a combination between two or more persons to do a criminal or unlawful act, or a lawful act by criminal or unlawful means.    There need not be a formal agreement between the conspirators, if it appears they acted in concert and with the design to consummate an unlawful purpose; nor is it necessary that each conspirator shall know of all the means to carry out the purposes of the conspiracy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 1-5;  Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1454-1461; vol. 8, p. 7613.]

**3. MONOPOLIES (§ 28*) — COMBINATION IN RESTRAINT OF TRADE — NOTICE TO · CONSPIRATORS—EVIDENCE.**

On an issue as to whether certain members of a trade union had knowledge of a conspiracy to compel a hat manufacturer to unionize his factory by means of a strike, picketing, and boycott, evidence that copies of a trade journal published by the United Hatters, in which articles relating to the affair were printed and which were distributed in vari ous factories without charge so that the workmen could read them if they desired, minutes of the meetings of the local unions of which de fendants were members and extracts from another monthly journal con taining a notice that all members of labor unions would be held re sponsible for unlawful acts of such unions, their officers and agents, a copy of which notice was sent to all hatters whose names appeared in the directory in the city where the manufacturer's factory was located, was admissible to show notice.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

**4. MONOPOLIES (§ 28*)—RESTRAINT OF INTERSTATE TRADE—NOTICE TO CON- SPIRATORS—QUESTION FOR JURY.**

In an action against members of a trade union for conspiracy in at tempting to destroy plaintiff's business or compel him to unionize his factory, whether defendants had knowledge of the conspiracy and par ticipated therein *held* for the jury.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

**5. MONOPOLIES (§ 28*)—ACTION FOR DAMAGES—INSTRUCTIONS.**

In an action against members of a trade union for conspiracy in aid ing an effort to compel plaintiff to unionize his factory, the court charged

that mere membership in a labor union and payment of dues did not amount necessarily to counseling, advising, aiding, or abetting in a conspiracy of the officers and members to destroy plaintiff's business, but that if the members paid their dues and continued to delegate authority to their officers and agents to commit unlawful acts which constituted an interference with plaintiff's interstate trade and commerce, under such circumstances as lead you to believe they knew or "ought to have known," and that such officers and agents were in that matter warranted in the belief, that they were acting within their delegated authority, then such members and no others were liable. *Held*, that the words "ought to have known," in the connection in which they were used, were intended to mean only that the jury must be justified in drawing the conclusion that the defendants must have known of the existence of the conspiracy, and so construed did not render the instruction objectionable as misleading.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

6. WITNESSES (§ 330*)—EXAMINATION—CROSS-EXAMINATION.

Where, in an action against members of a trade union for fraudulent conspiracy in restraint of interstate commerce to regulate plaintiff's business or to compel him to unionize his factory, two of the witnesses testified that they continued to be members of the union after the suit was brought, evidence of their payment of dues after the complaint was served, offered solely as a matter of cross-examination bearing on the truthfulness of their testimony in chief, was competent.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1106–1108; Dec. Dig. § 330.*]

7. MONOPOLIES (§ 28*)—RESTRAINT OF TRADE—ACCRUAL FOR SUIT BROUGHT.

In an action for fraudulent conspiracy in restraint of interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), evidence showing damages which accrued after suit brought because of acts previously committed was properly admitted.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

8. MONOPOLIES (§ 28*)—INTERSTATE TRADE—RESTRAINT—INSTRUCTIONS—DAMAGES.

In an action for conspiracy in restraint of interstate commerce in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, § 7, 26 Stat. 210 (U. S. Comp. St. 1901, p. 3202), an instruction that the only acts for which plaintiff may recover are such as are alleged in the complaint and as were done by defendants or their agents before suit brought, and that plaintiffs were entitled to recover all damages which are the proximate and natural result of such acts, including such damages as may have continued or resulted therefrom after suit was commenced, but that no recovery could be had for acts constituting a continuance of the conspiracy after suit brought, was proper..

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. § 28.*]

In Error to the District Court of the United States for the District of Connecticut.

Action by D. E. Loewe and others against Martin Lawlor and others. Judgment for plaintiffs, and defendants bring error. Affirmed.

On writ of error to the District Court for the District of Connecticut to review a judgment entered November 15, 1912, in favor of the plaintiffs and against the defendants for $252,130, being the amount of a trebled verdict,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

interest, costs and counsel fees. This controversy has been before the courts for nearly a decade. It first appears in the reports in (C. C.) 130 Fed. 633, where a demurrer to a plea in abatement was sustained. A motion to compel the plaintiffs to correct their complaint was denied in (C. C.) 142 Fed. 216. And in (C. C.) 148 Fed. 924, a demurrer to the complaint was sustained upon the ground that the complaint did not allege an interference with interstate commerce. From this decision a writ of error brought the case to this court which, after stating the facts, certified to the Supreme Court the following question:

"Upon this state of facts can plaintiffs maintain an action against defendants under section 7 of the Anti-Trust Act of July 20, 1890?"

Both sides joined in asking that the entire record be sent to the Supreme Court, which was done and the case came before that tribunal upon the complaint and demurrer. Under section 6 of the Judiciary Act of 1891 (Act March 3, 1891, c. 517, 26 Stat, 828 [U. S. Comp. St. 1901, p. 549]), the court was called upon to "decide the whole matter in controversy in the same manner as if it had been brought there for review by writ of error or appeal."

In an elaborate opinion by Chief Justice Fuller the court decided that the complaint stated a case within the statute and overruled the demurrer. 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815.

The case then came on for trial upon the merits on October 13, 1909, and, with various adjournments, lasted until February 4, 1910, when the court directed a verdict for the plaintiffs, sending to the jury the question of damages only, which they assessed at $74,000, which was trebled under the law.

The defendant then sued out a writ of error and this court, being of the opinion that the question of the defendants' liability should have been submitted to the jury, reversed the judgment and remanded the case for a new trial. A petition for a rehearing was denied by this court, 187 Fed. 522, 527, 109 C. C. A. 288. The plaintiffs thereafter petitioned the Supreme Court for a writ of certiorari which was denied, 223 U. S. 729, 32 Sup. Ct. 527, 56 L. Ed. 633. The new trial was commenced on August 26, 1912, and on October 11th a verdict was rendered for the full amount demanded. The sections of the Anti-Trust Act which are involved are the first, second and seventh. They are as follows:

"1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

"7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover three fold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

The parties will be alluded to hereafter as plaintiffs and defendants as they appeared in the District Court.

Alton B. Parker, of New York City, and Frank L. Mulholland, of Toledo, Ohio, for plaintiffs in error.

Daniel Davenport, of Bridgeport, Conn., and Walter Gordon Merritt, of New York City, for defendants in error.

Before COXE, WARD, and ROGERS, Circuit Judges.

COXE, Circuit Judge (after stating the facts as above). [1] When this cause came on for the second trial all of the fundamental questions of law had been disposed of.. That the Anti-Trust Act is applicable to such combinations as are alleged in the complaint is no longer debatable. It makes no distinction between classes, employers and employés, corporations and individuals, rich and poor, are alike included in its terms. The Supreme Court particularly points out that although Congress was frequently importuned to exempt farmers' organizations and labor unions from its provisions, these efforts all failed and the Act still remains, after nearly a quarter of a century of trial, unmarred by amendment, in the language originally adopted. In short, the court held that if the plaintiffs proved the conspiracy or combination as alleged in the complaint, they were within the Anti-Trust Act and entitled to the damages sustained by them.

The plaintiffs proved, either without contradiction or by testimony which the jury was justified in accepting as true, the following propositions:

First. That they were engaged in making hats at Danbury, Connecticut, and had a large interstate business, employing union and non-union labor.

Second. That the individual defendants are members of a trade union known as the United Hatters of North America, which was organized in 1896 and, with a few exceptions unnecessary to consider, paid dues to the local unions at Danbury, Bethel or Norwalk, Connecticut. These dues, after deducting a certain percentage for the expenses of the local unions, were sent to the treasurer of the United Hatters.

Third. That the United Hatters were affiliated with the American Federation of Labor, one of the objects of the latter organization being to assist its members in any "justifiable boycott" and with financial help in the event of a strike or lockout.

Fourth. That the United Hatters, through their connection with the Federation of Labor and affiliated associations, exercised a vast influence throughout the country and, by the use of the boycott and secondary boycott, had it in their power to cripple, if not destroy, any manufacturer who refused to discharge a competent servant because he was not a member of the union.

Fifth. That in March, 1901, the United Hatters had resolved to unionize the plaintiff's factory and informed Mr. Loewe to that effect, their president stating that they hoped to accomplish this in a peaceful manner, but if not, they would resort to their "usual methods."

Sixth. That on the morning of July 25, 1902, the plaintiffs' employés were directed to strike and the union men left the factory on that day, the non-union men the day after.

Seventh. That this strike temporarily paralyzed the plaintiffs' busi- ness and they were not able to reorganize until January, 1903, and then with a force many of whom were unskilled.

Eighth. That almost immediately after the strike a boycott was established and agents of the Hatters were sent out to induce the plaintiffs' customers not to buy any more hats of them. This boycott was successful, and converted a profit of $27,000 made in 1901 into losses ranging from $17,000 in 1902 to $8,000 in 1904, destroying or curtailing a large part of the plaintiffs' business carried on between Danbury, Connecticut, and several other states.

It appears, then, that a combination or conspiracy in restraint of interstate trade was entered into to the great damage of the plaintiffs and that all of the defendants who participated therein or aided and abetted the active workers in the conspiracy or contributed to its support are liable if they knew of its existence.

[2] The principal question of fact, therefore, is, did the defendants know of the conspiracy or is the evidence of such a character that the jury were justified in finding that they must have known of its existence? And here it is important to remember that the law does not require the proof of conspiracy by direct and positive proof. This is true even in criminal cases and the reason therefor is plain. Conspirators do not put their agreements in writing; they do not disclose their identity or publish their plans. They work in the dark, they may never be seen together, their acts may have no apparent relation to each other, but if it appears that they are all working to accomplish an unlawful purpose which is for their common benefit and in the gains of which all are to share, a jury is justified in finding the existence of a conspiracy. A conspiracy has been well defined as:

"A combination between two or more persons to do a criminal or an unlawful act or a lawful act by criminal or unlawful means." 8 Cyc. 620.

It is not necessary that there be a formal agreement between the conspirators. If the evidence satisfies the jury that they acted in concert, understandingly and with the design to consummate an unlawful purpose, it is sufficient. It is not necessary that each conspirator shall know of all of the means employed to carry out the purposes of the conspiracy. If then, the evidence is sufficient to warrant the jury in finding that the defendants knew of the unlawful purpose, by means of boycotts and strikes, to destroy the interstate business of the plaintiffs and thereafter continued to aid and abet such purpose, it is sufficient. Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; U. S. v. Cassidy (D. C.) 67 Fed. 698.

As to the defendants who were in the employ of the plaintiffs at the time of the strike and participated therein, we understand that it is not pretended that they were ignorant of the general purpose of the United Hatters. As to the remainder, estimated by the defendants' counsel to be about ninety per.cent., it is contended that they knew nothing of the purpose of the strike except that it was "to establish union conditions in that particular (Loewe's) factory."

The plaintiffs insist that the measures adopted by the United Hatters for establishing "union conditions" were well known to every

member of the organization, as they had been frequently enforced before. The plaintiffs assert that every member of the union knew that these measures consisted in calling a strike and if that failed then in declaring a boycott and withdrawing patronage from all who dealt in the prohibited goods. To accomplish these ends it had been customary in the past to send so-called "missionaries" to the customers of the manufacturer throughout the country to induce them to refuse to handle his goods under threat of the destruction of their own business if they refused.

[3, 4] The defendants reside at Bethel, Norwalk or Danbury, all in the same general locality and so near that it is highly improbable that an event of vital importance to one union would not be known to the other two. But in order to show that the dispute between Loewe and the union excited general interest in the community, newspaper articles published in these towns were introduced in evidence, not as proof of the circumstances therein narrated but to show the improbability of the defendants being ignorant of matters which were constantly being made public and were of vital significance to them, relating as they did, to a controversy which might impair or destroy their own means of livelihood. As to one hundred and fifteen of the defendants it was stipulated that if called as witnesses they would testify "that they read with more or less regularity some local newspapers in their respective towns, but not completely or invariably." As to the Journal of the United Hatters, it was stipulated that the secretaries of the local unions in question received copies which were distributed in the various factories without charge, so that the workmen there could read them if they desired to do so. The plaintiffs introduced the minutes of the meetings of the local unions of which the defendants were members; also extracts from the Federationist, a monthly journal of the Federation of Labor and a notice, warning all members of labor unions that they would be held responsible for unlawful acts of such unions, their officers and agents. A copy of this notice was sent to all hatters whose names appeared in the Danbury Directory. It cannot be denied that all this evidence was competent as to those who actually received it or had knowledge of it and we think it was for the jury to say whether it was sufficient to put the alleged conspirators upon notice of the illegal measures by which it was proposed to enforce the demands of the defendants.

We do not deem it necessary to deal with each of these pieces of evidence separately, principally because, in our judgment, such an analysis would be a wholly inadequate and indeterminate procedure. It may be that many of the items considered alone failed to give the adequate information, but considered in its entirety have not the plaintiffs shown a situation where the jury were justified in finding that the members of the unions knew what was being done? A bitter and acrimonious dispute was being waged between employers and employés in a comparatively small community. It was a dispute which involved loss of employment on the one side and the loss of a flourishing business on the other. The progress of the controversy was described in the local press and in the papers published by the unions. Was it not

clearly a question of fact for the jury to say whether the defendants, thus vitally interested, could have remained ignorant of the measures adopted by their own societies in their behalf? We are clearly of the opinion that it was.

The learned counsel for the defendants argue, and cite numerous cases to sustain the contention, that labor unions are lawful. No one disputes this proposition. All must admit, not only that they are lawful, but highly beneficial when legally and fairly conducted, but like all other combinations, irrespective of their objects and purposes, they must obey the law.

Any discussion of these questions is rendered unnecessary by the decision of the Supreme Court overruling the demurrer. That the complaint states a cause of action is no longer debatable. The question is, does the testimony sustain the allegations? Without attempting to review the testimony in detail, it suffices to say that the jury were fully justified in finding that the measures adopted by the defendants prevented the free flow of commerce between the states. The great bulk of the plaintiffs' business was in states other than Connecticut, to which states the product of their factory was shipped and the proof shows that they suffered great pecuniary loss, equal at least to the amount found by the jury, because of their inability to sell to their interstate customers.

[5] The court charged the jury as follows:

"Now if this evidence falls short of satisfying you that certain of these defendants did know of this unlawful conspiracy, or were in duty bound to know of it, or did tacitly approve of it, then such defendants should be acquitted, if any there may be; or, in other words, assuming that there was a conspiracy to violate the federal statute, as I have explained to you, and that the statute was, in fact, violated, to the damage of the plaintiffs, then every person who had a part in planning or a hand in executing, or aided, or abetted therein, is jointly liable. Membership in a Labor Union and the payment of dues, are not acts of themselves that necessarily constitute counseling, advising, aiding or abetting. Membership and payment of dues are the life of the voluntary association, and are the foundation of all its authority and the source of financial assistance in executing that authority.

"If these members paid their dues and continued to delegate authority to their officers and agents to commit unlawful deeds, which, in this case, is the interference with the plaintiffs' interstate trade and commerce, under such circumstances as lead you to believe that they knew, or ought to have known, and that such officers and agents were, in that matter, warranted in the belief that they were acting within their delegated authority, then such members are jointly liable, and no others."

The defendants excepted to this charge, and have presented the question by proper assignments of error. The principal criticism of the charge is directed to the use of the words "or ought to have known" in the last paragraph quoted above. If these words had been used alone, with no qualification or explanation, there might be some room for criticism, but when considered in connection with the rest of the charge, we are entirely satisfied that the jury could not have been misled. As previously pointed out, in cases of conspiracy it is sufficient if a state of facts be shown from which the jury are justified in drawing the conclusion that the defendants must have known of the existence of the conspiracy. It was in this sense that the judge used the

words "ought to have known." He left to the jury the question which the judge, on the preceding trial regarded as established by such overwhelming proof that he decided it as matter of law, viz.: Did the defendants know of the combination to destroy the plaintiffs' business?

In cases where actual knowledge is not shown, the question is, was the proof of such a character that the jury was justified in finding that a member of the local unions in good standing, attending their meetings, paying his dues, having access to their publications, knowing their methods and having struck with his fellow members because of the plaintiffs' refusal to be dictated to by the union as to the manner in which their business should be conducted, must have known what was being done? A soldier who with his regiment charges the enemy's line can hardly be heard to assert that he did not know a battle was in progress.

In Martin v. Webb, 110 U. S. 7, at page 15, 3 Sup. Ct. 428, at page 433 (28 L. Ed. 49), Mr. Justice Harlan says:

"Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business."

[6] It is true that in our former opinion we said that testimony of the payment of dues by the defendants after the complaint was served was inadmissible, but we do not think that this ruling applies to the testimony of Hoy and Bressen, for the reason that the answers of these witnesses that they continued members after the suit was commenced, elicited on cross-examination, were admitted "solely as a matter of cross-examination bearing upon the truthfulness of the testimony in chief." That it was proper for this purpose we have no doubt. In order to understand the attitude of the witnesses to the controversy and to the parties, it was competent to show what their relations were to the parties. The plaintiffs on cross-examination had the same right to show that the witness was a member of the local union in good standing, as the defendants would have to show that a witness called by the plaintiffs was a partner in their firm. In either case the testimony shows the jury what manner of man the witness is and what interest he has in the result.

[7] We see no error in the admission of testimony showing damages accruing after the commencement of the action. It must be admitted that it is for the interest of all parties that this controversy be disposed of finally in a single action. If a plurality of actions are brought the defendants will have good ground for the complaint that they are subjected to unnecessary expense and annoyance by being compelled to defend a second action, the trial of which will consume several months. The charge of persecution in such circumstances would not be without justification.

[8] The judge charged the jury on this subject as follows:

"The only acts of the defendants for which the plaintiffs may recover damages in this case are such acts as are set forth in the complaint and as were done by the defendants or their agents before the suit was commenced, and the plaintiffs are entitled to recover all damages which are the proximate and natural result of such acts, including such damages as may have continued or resulted therefrom after the suit was commenced by the plaintiffs, but cannot recover in this suit for any damages which are the result of the continuation of the alleged conspiracy after the suit was commenced or which are the result of the performance of any acts in furtherance of said conspiracy after the suit was commenced."

We think this instruction states the rule correctly; it is based upon authority and common sense. The trial proceeded throughout upon the theory that the only acts of the defendants for which a recovery could be had must have taken place before the suit and must have been acts alleged in the complaint. Damages resulting or continuing from such previous acts might be recovered in the present suit, but no damages resulting from acts committed in furtherance of the conspiracy after the commencement of the suit could be so recovered. In other words, if the damages due to acts done previous to the suit continued thereafter, the plaintiffs could recover, but they could not recover for acts subsequent to the suit or for damages resulting from a continuance of the conspiracy after the commencement of the suit. Assuming that the suit was commenced September 30, 1903, the plaintiffs were permitted to recover damages for acts done prior to September 30, although the damages resulting therefrom continued after that date. The plaintiffs were not permitted to recover damages resulting from the continuation of the conspiracy after September 30, and they were not permitted to recover damages resulting from an act done after September 30, 1903.

We see no error in the charge or in the rulings of the judge upon these questions, which rulings are sustained by the following authorities: New York, etc., R. Co. v. Estill, 147 U. S. 591, 13 Sup. Ct. 444, 37 L. Ed. 292; Occidental Con. Mining Co. v. Comstock Co. (C. C.) 125 Fed. 244; Cooper v. Sillers, 30 App. D. C. 567.

Other exceptions were taken which are argued in the defendants' brief, but we do not deem it necessary to discuss them further than we have already done, in view of the decision of the Supreme Court and our own previous decision.

No one can examine this voluminous record without being impressed with the fact that the trial was conducted with perfect impartiality and with a determination on the part of the judge that both parties should have an absolutely fair trial. We are convinced that the defendants have had such a trial and that no error was committed which would justify us in imposing upon the parties the expense and delay of a third trial.

The judgment is affirmed with costs.