Morgan, J.
This is an action by the Taylor & Boggis Foundry Company, a corporation, plaintiff, against a long list of individual defendants and five of' such individuals as representatives of a Class composed of the membership of Locals 27, 218 and 430 of the International Molders Union of North America, and said International Molders Union itself. The locals and international union are incorporated associations. The plaintiff originally attempted to make the associations parties as corporate or giiczsi-corporate entities; but, on motion made and granted to quash service on such associations, plaintiff amended its petition to state a cause of action against the membership thereof as a class, and the original title of the case is misleading in naming said unions and locals as distinct entities. For the sake of convenience, however, I may refer to the defendant class as the union or unions.
The plaintiff is engaged in the foundry business, and operates two plants in the city of Cleveland several miles apart, known as No. 1 and 2 respectively..
On or about • August 21, 1916, it was employing at No. 1 plant about 52 molders and coremakers in the foundry department, and at No. 2 plant about 137 molders and córemakers in the foundry department. Besides such employees, plaintiff had a force of men engaged in other kinds of work at both plants.
' The membership of said union is composed only of journeymen molders and coremakers, that is, men who are supposed to have served not less than four years as apprentices..
*163 On or about August 21, 1916, the said union called a strike at plaintiff’s plants, and all the plaintiff’s molders and core-makers went out. It was not shown that they all went out' as strikers, but at least substantially all stopped work, and a large percentage of them either had been members or did then join the union, some of such. going back to work later when the plaintiff started its works.
Said plants had been operating as “open” shops. The plaintiff did not attempt to operate the molding departments of either of its plants between August 30, 1916, and October 18, 1916.
Immediately after the calling of the strike the unions placed pickets at each plant, and'a series of negotiations was had between plaintiff’s officers and the officers of said unions, continuing until October 18, 1916, when all negotiations were broken off — for what reason is not shown. The plaintiff then started to operate the- molding department of its No. 2 plant. The molding department of its No. 1 plant has not been operating since the strike was called.
The strike is being conducted by the unions through the agency of the third vice-president of the National Union, the defendant, Lawrence O’Keefe (who resides in Cincinnati, but has spent nearly all his time in Cleveland since the calling of the strike), a so-called conference board, composed of about thirty delegates from the three locals, and a strike committee, comnosed of thirty delegates from the three locals. The membership of the strike committee and of the conference board is practically the same. The individual members of the conference board and strike committee most active in the management of the strike for the union have been the defendant Fred L. Baumgartner (who is also financial secretary to each of the three locals), Richard Kennedy (who has been acting as a business agent for the three locals), William Brown, assistant business agent, and John Langley,.who has been primarily in charge of the pickets at plaintiff’s plant.
The petition sets forth the .extent of plaintiff’s business, and in short alleges that the defendants and the membership of said *164 unions have' conspired to injure said business, first, by the calling of said strike, and -secondly, pursuing and threatening to continue :to pursue a course of conduct, set forth more or less in detail, designed to and having the effect of intimidating plaintiff’s employees (principally the molders and coremakers), who went back to work October 18, 1916, or who have, as new men, sought employment with plaintiff.
The prayer of the petition is for a permanent injunction against the various practices complained of, running against the individual defendants, and also the whole membership of said local unions, if not the International Union generally.
The only answer filed was 'by the defendants 0 ’Keefe, Baumgartner and Kennedy, for themselves as individuals and also as representing the class- composed of the membership of said unions, and set forth more or less of a short history of the said ¡International Molders Union and the relations that plaintiff has had therewith. It admits the calling of the strike by said- unions, and further details facts pleaded in justification for the calling of said strike, and generally denies the facts, with some exceptions, and responsibility for all acts of violence and intimidation.
Plaintiff’s reply to said answer is, in substance, a general denial.
At the commencement of the hearing plaintiff gave notice that it would not offer evidence to prove the allegations of its petition as to an unlawful conspiracy on the part of the defendants, or the class, in the calling of said strike, but would rest its case on evidence of acts and threats, showing violence to and intimidation of its employees and agents, resulting in irreparable -damage to its business, and proving, as claimed by plaintiff, a common and unlawful design on the part of the defendants ¡actually concerned, as well as the whole class, to injure it in its business.
This announcement, as was agreed by both sides, took out of the ease any burden either side might have been under to prove the lawfulness or unlawfulness of the action of said unions in the calling of said strike,
*165 In support of fits charge of a conspiracy to injure it by the defendants and the class, plaintiff called over one hundred witnesses, a number being put on the stand again and again, to testify to various threats and acts of violence.
Passing for the moment the question of responsibility of either the individual defendants or the class, it must be admitted that plaintiff’s case did tend to show the following occurrences that happened between October 18, 1916, to time of trial.
1. That the automobiles in • which plaintiff transported its employee molders and coremakers back and forth to work most of the time since October 18, 1916, were generally followed by automobiles more or less filled with union men, who, after the cars got beyond the range of police guard generally maintained around the plant since October 18, 1916, would call out in a threatening manner to plaintiff’s employees and use abusive and obscene language to them, accompanied with many threats.
2. That when the plaintiff’s machines would seek to run away from the union machines, taking advantage of congestions of traffic, etc., there would result chases dangerous to the life and limb of those in both cars and to the public generally. The company would have in use something like five or more ears; and there would usually be a similar number of union cars, at least in the afternoon when the men left for home.
3. That a number of collisions between plaintiff’s automobiles and the union’s machines was shown to have occurred, some of these collisions appeared to have been deliberately caused by the union drivers.
4. In something like a half dozen cases a committee of union men called at the homes of old employees of the plaintiff, and soliciting them to quit work for the plaintiff, and threatening them with violence if they did not quit. That in such cases said employees did not quit and that shortly thereafter so-called scab cards were distributed in the vicinity of the homes of said employees, and shortly after that,' in the night time, stones were thrown through the windows of said employee’s homes, endangering the members of their families. On November 10 this happened at the home of four or five of the employees located *166 in widely separated parts of the city. The scab cards or circulars contained the name and address of one or more of said employees, and quoted dictionary definitions of the work scab — “a mean, dirty, scurvy thing; one afflicted with the itch; a person who takes the place of men on strike,” and “don’t you think these men should be socially ostracised?” or language similar thereto. These scab cards were printed with the authority of the defendant Baumgartner, and distributed by some of the defendants.
5. Aside from the breaking of windows, about twenty separate acts of bodily violence, on different occasions and to different company employees, were testified to by plaintiff’s witnesses as having been committed by the defendants or their associates, and in about a dozen of these cases the defendants’ testimony admitted the presence of one or more of the defendants. Some of these assaults were of a very serious nature.
6. In twenty-five or thirty cases the plaintiff’s testimony showed threats of bodily harm, made by some of the defendants or some of their associates, to different individual employees, followed in some eases by assaults actually made, as previously mentioned.
There was testimony received of several cases of violence that might be said not to have been fully coupled up with one or more of the defendants.
The foregoing, as thus tabulated, were occasions of threats and violence offered to plaintiff’s employees as distinguished from its officers and the drivers of its automobiles. There was-testimony of threats made to such officers and drivers on a number of occasions.
Put on a percentage basis, plaintiff’s proof tended to show that out of seventy-five to one hundred molders and core-makers that plaintiff has had in its employ at No. 2 plant since October 18, something like twenty-five per cent, or more of them have actually been assaulted, or their houses stoned, or violence of some sort offered to them; and in addition a number of other, employees, not molders or eoremakers, have been assaulted, and threats of violence have been made to a. number of others in'individual cases, not speaking of the gen *167 eral threatening language used while.the company automobiles have been followed by the union machines. It must be remembered that the strike concerns a comparatively few number of men who have continued working for plaintiff — about 100 — who have largely been the'subject of the violence in question. The percentage of casualty is warlike in its proportions, and some of the assaults were serious in their consequences. One chance in four to get hurt during four months’ service is something to be considered.
Many of the cases of violence testified to by the plaintiff were fully corroborated by entirely disinterested witnesses, and there was strong corroboration of the case made by plaintiff in the admitted circumstances.
Such being the case made by the plaintiff’s testimony, the defendant called twenty-five or more witnesses, nearly all of whom were the defendants themselves, who generally denied all overt acts. Where the presence of any defendant at the place of an occurrence was admitted, the particular threat or act of violence .was, as a rule, denied so far as anything done by the particular, defendant or defendants was concerned, except in a few cases of drunkenness on the part of some union men. To be more specific, testimony offered by the defense went so far as to generally deny the calling by union men of abusive or obscene names, even the úse of the word scab or the use of any threatening language.
The position of the defendants at all times was that of. denying any design to intimidate plaintiff’s employees or agents, but claiming merely a purpose to peaceably persuade plaintiff’s employees to quit work, and a purpose to spread the propaganda of collective bargaining through union agencies. The purpose claimed by the defense for the practice of union automobiles following the companies machines was, to ascertain the residences of plaintiff’s employees, and in that way obtain the opportunity to interview such employées at their homes or on. the way to and. from work. ■ The court must conclude, however, .from the evidence, that the residences of many of plaintiff’s old employees must have been known to-the union officials before' Oe *168 tober 18,1916. Most of them, according to the defendants’ test! mony, had joined the union at the time of or shortly after calling the strike. Then, when a committee of one or more union men did visit the home of an employee, plaintiff’s testimony shows that, coupled up with an attempt to persuade, there were threats of violence if the employee did not quit; and where the persuasion was not successful, scab cards were distributed, and stoning of employees’ houses followed in a number of cases. The fact that this stoning took place, largely all on one night, in rather widely separated parts of the city, tends to prevent any inference that it might have been a mere “neighborhood protest” arising from the distribution of the cards. And further, the defendants practically admitted that no record was kept of names and addresses or any real attempt made to follow up any information that they might have obtained through the use of automobiles. It was shown, though, that the company machines did not go directly to and from the homes of employees when taking them back and forth to and from the shop.
The denial on the part of witnesses for the defense that the word scab was used, as testified to by practically all of plaintiff’s witnesses, does not, in the opinion of the court, at all comport with the probabilities. Neither can the court believe that there was not threatening and abusive and obscene language used by many of the union men, as testified to by plaintiff’s witnesses. Aside from the testimony, the common experience of men is that, even where arguments are peaceably started with good intentions, if an accord is not quickly arrived at, strong language nearly always results, and generally on the part of that side which is forcing or inviting the argument. The most complete denials on the part óf the defendants’ witnesses in these regards, though somewhat minor as compared with the question of physical violence, tends to shake the confidence of the court in the frankness of such testimony offered by the defense, to say the least. I fully appreciate there were many occasions where an employee of the plaintiff could only understand a little of the English language, and might have misunderstood the meaning of a union man’s words or actions, but in such eases the union *169 man concerned, knew such, facts and it was not likely that he would permit himself to be misunderstood; and every one knows that it is the emphatic, if not polite, words used on such occasions that a foreigner often first becomes acquainted with. At least defendants must assume responsibility for a misunderstanding.
So far as cases of actual violence were concerned the presence at the scene of some of the defendants was admitted in many of the instances, and in many other eases there was strong corroboration of the plaintiff’s testimony. A court could not help but get the impression that some of the defendants who did not want, themselves, to indulge in actual violence, passed the word to others who did not have such compunction. A defendant who disclosed to another the fact that a company employee, who was present, was working in a “struck” shop, merely for the purpose of conveying such information, might not be held responsible; but if such information was conveyed for the purpose of inviting the third person to do violence to such employee, then such informant is just as liable for the blow that is struck as the actual assaulter. Good morals would make him the principal offender. When one comes as a witness in the court he is sworn to tell the truth, the whole truth and nothing but the truth. It is my opinion that if this oath had been strictly complied with by some of the defendants who testified, they would, on the witness stand, in answer to many questions asked them, have had to admit a responsibility for doing of encouraging acts of violence and making threats of bodily harm to plaintiff’s employees and agents that would, on their testimony alone, fully have established a conspiracy on their part, with others who did or took part in encouraging such acts, to so conduct a strike against the plaintiff as would entitle plaintiff ■ to an injunction against themselves and many of the individual defendants.
This case, like that of an employee injured through the alleged negligence of his employer, requires that the plaintiff make out a case by a preponderance of the evidence. The plaintiff did so in the respects I will point out.
*170 In the court’s opinion, it was shown by a clear preponderance of the evidence that the witnesses, Falatko, Kopaz, Zlatni and VaGik .were assaulted substantially as testified to by the plaintiff’s witnesses; and that the defendant, William Brown, was present and a party to or an aid to each assault.
Likewise the court thinks that the defendant, Fred L. Baumgartner, was at the least an indirect party to the stoning of. the houses of various of plaintiff’s employees, and the Vaeilc assault ; and that the said defendants, Baumgartner, Brown, Kennedy and Langley have on many occasions, used threatening and abusive language to the company employees that was intended to and did intimidate them, and was the cue and guide for the other union men and sympathizers who did picket duty or rode in the union automobiles.
By the admissions of defendant Langley, it was shown that, so far as the voluntary as well as the paid union pickets were concerned, they .would recognize his orders, and the court has not much doubt that any real attempt on the part of said four principal defendants to prevent threats and violence, both around the plaintiff’s plant as well as elsewhere, when they were present, would have been most effective to prevent unlawful acts. They, however, seem to have intentionally pursued the policy of encouraging rather than discouraging violence, except during the day time in the immediate vicinity of the plant. •
The evidence shows that the following named other defendants also took part in the making of threats, and in the doing of acts of violence, showing an evident knowledge and appreciation of an unlawful design to which they thereby became a party, namely: Joseph Bullock, George Pigeon, Steve Schubert, W. B. Yandelier, and others whom the court will add after checking the full list of defendants and the evidence.
It was also shown that the presence of a great many pickets and the use, as made by the strike managers, of automobiles, interfered seriously with plaintiff’s business and served to intimidate the employees. This was an interference with plaintiff ’s property and the continuance thereof would clearly cause irreparable damage.
*171 The court up to this point has' tried to point out its findings of fact as to those actually guilty of taking part in an unlawful conspiracy to do harm to plaintiff’s business. Plaintiff contends that the relationship of defendants Baumgartner, Brown, Langley and Kennedy to the whole membership of the unions was such that the court must find all their associates, as well as all the membership of said unions, also parties .to such conspiracy.
This is contended for — as I catch the argument.of plaintiff’s counsel — on two grounds: First, because the union or unions, as a class, called the strike; and it should be inferred, in the light of all the facts, that such action contemplated the use of intimidation, etc., or, if not, that the practice of violence and threats has been ratified by the class. Second, that the principles of the law of agency apply to make the class liable for the acts of all the strike managers appointed to conduct the strike.
As to the first of these claims, it must be remembered that there is no proof that an express agreement existed between any of the defendants to accomplish an unlawful purpose, or to carry out a lawful purpose by unlawful means. The case made by the plaintiff rests on direct proof of actual violence, threats, etc., and the inferences that may be drawn therefrom indicating a common design. There is a legal presumption that a man’s purposes are lawful until the contrary is shown. A like presumption applies to an association of men. And this same presumption must be permitted as to the pupose of the calling of the strike by the unions. A strike can be carried on in a lawful manner, and there is nothing in this record that warrants the court in finding that the class as a whole had any common design but for a lawful purpose. It does cot appear that the membership of the class, three thousand or more, as a body, by the calling of the strike, thereby sanctioned a course of conduct towards the employees of plaintiff that would put them in fear of their lives when they went to work each day and make the members of their families part with them in the morning with much the same feeling as if they were going into battle. There is much in the case that indicates those of the defendants who accomplished or encouraged intimidation did so “to get results,” and *172 to get the credit therefor, and did not want to ask or to be asked questions.
The defendant 0 ’Keefe and the members of the union strike committee and conference board who are not shown to have actually taken part in or encouraged violence or the making of threats, it would seem, would or should have known of what was actually being done in the way of violence and the making of threats, but there is no tangible proof thereof. How would they have learned? Can the court assume that those who actually committed acts, largely criminal in their nature, would have truthfully reported the facts to their superiors or associates, much less the class at large, particularly in the face of the various criminal proceedings pending against some of them during most of the time in question, as shown by the proof? If some reports were made, how can the court assume that they differed from what the defendants concern have testified to in open court under oath ? It is not shown just who of the members attended the various meetings of the strike committee or the conference board. The testimony does show that at the various meetings of the various locals held during the progress of the strike, at various times, reports or addresses were made by defendants Baumgartner and Kennedy of how the strike was proceeding; but these reports are not shown to have actually informed as to the violence practiced, and it is shown that only five to ten per cent, of the actual membership of the locals were commonly in attendance at such meetings. If it had been shown that those members of the class not actually concerned in violence had generally, as a body been informed, and had expressly or impliedly asquiesced in acts of the strike managers, then they might well be held as co-conspirators, but such is not the case made.
Do the ordinary rules of agency apply to make the class liable? The class is called a voluntary association, but is that entirely true ? It seems to me that many labor organizations or unions are not entirely free-will affairs. Men must work to live, and to live men trained in one trade must, practically speaking, work at that trade. Employers in many lines are in agreement with the labor organizations; and to get employment at his trade a worker must join the union, even where there are some shops *173 •that are “open” and some “closed” in the same line of business. All workers can not find a place in the “open” shops. I am not saying that the spread of the union idea is a bad thing. I believe it is the better way. But it seems to me that the economic pressure that often exists should be admitted by all, and some degree of social pressure must also be recognized.
A religious organization or a political party is clearly a voluntary'organization, and yet I know of no accepted doctrine that makes the membership of such organizations liable for the torts of its agents not committed within the line of their express or implied authority. DeVoss et al v. Gray et al, 22 O. S., 159, 169; Rianhard et al v. Hovey et al, 13 Ohio, 300, 304.
A corporation organized for profit is based on contract, purely voluntary; the scope of its business is expressly agreed to as a rule; and the agent of such a corporation might well be held, as in the case of Electric Company v. Black, 95 O. S., 42, to bind the corporate property to answer for his tortious acts done within the scope of his authority; but the stockholders are not bound personally. If the class as a whole are liable to be enjoined because of the acts of a few, they would also be liable jointly and severally to pay damages. To hold the class liable it would have to be under some rule of law that constructively made them liable without notice, or constructively charged them with notice. I know of no such rule that applies. Certainly, however, if the class as such, either expressly or impliedly, authorized or acquiesced in the acts complained of, then they would be co-conspirators and liable; but such a finding must be based on evidence, and by no fair inference can such fact be said to have been sustained in this case by a preponderance of the evidence.
In support of my conclusion of law in this regard, I cite Martineau v. Poley, 113 N. E., 1038 (Mass.); Glass Mfg. Co. v. Glass Bottle Blowers Association, 59 N. J. Eq., 49; Mitchell v. Hitchman Coal & Coke Co., 214 Fed., 658-713; Hill v. Eagle Glass & Mfg. Co., 219 Fed., 719.
• In the case of Lawler v. Loewe, 235 U. S., 534 (and the same case below, 209 Fed., 721),-as I.understand it, the court found the union membership liable, not on any theory of construe *174 tive representation, but because of knowledge and acquiescence found to have-existed as a fact.
I believe an injunction should-issue against Lawrence O’Keefe, Fred L. Baumgartner, William Brown, John Langley and Richard Kennedy, and all the members of the strike committee and conference board and their successors in office (by whatever name called), and associates active in the actual management of the strike, restraining them against the excessive use of automobiles and the excessive picketing of plaintiff’s plant. It evi> dently was understood by this part of the actual defendants and such of the class that the strike would be or was being conducted by such means, and they must be held liable for the abuse of the right to use these instruments that all contemplated would be or knew were being used.
- As to the defendants Fred L. Baumgartner, Richard Kennedy, John Langley, William Brown and the other defendants who appear to have been party to the plan, more or less defined, of furthering the strike by intimidating the plaintiff’s employees, I think an injunction should issue, restraining them from all such acts. The. court will check the list, of defendants with counsel for both sides, so as-to not include in the latter class those who may not fall within such designation. But it must be realized that those of the preceding class, or any members of the unions, who practice acts of violence and intimidation after the issuance of the order against such acts, and with knowledge thereof, will thereby in effect place themselves in the class so enjoined against such practices, and be subject to punishment for contempt. See cases cited 22 Cyc., 1012, notes 2 and 3.
I want now to pass to just what the decree should cover. Certainly an order against proposed acts of violence and intimidation can issue, even though such acts may .be criminal in their nature.
See Labat on Mcster & Servant, Section 2715, p. 8397, and cases there cited; 22 Cyc., 903, note 37 and cases.
Any hesitancy the court might have in covering such acts by an injunction would be based on .policy rather than lack of 'authority. And as to the particular defendants mentioned who *175 have clearly gone beyond their rights in encouraging or doing violence, there is no good reason why the court should not grant such relief as the law provides to protect the plaintiff in its property rights.
The only professed purpose the defendants have had in picketing the plaintiff’s plant and in the use of automobiles has been to peaceably persuade, and to obtain information for such purpose. The court .can easily realize that there is a legitimate field of competition between union labor and the unionized shops, and non-union men and the “open” shops, particularly if the cost of production is greater in the union shops because of higher pay, etc.; but such competition is not a game to be played without rules, any more than is competition in other lines.
' More than two men as pickets on the public streets in the vicinity of plaintiff’s shops will not be permitted; and the use of automobiles by the union for the purpose of following plaintiff’s employees to and from their work will be limited to one machine with not more than two men therein, other than said two pickets.
As to the threats and the distribution of so-called scab circulars, I believe that the weight of mere precedent is in favor of the power of a court of equity to enjoin such when done in the furtherance of an unlawful conspiracy against property rights. Having this opinion, I have taken not a little time to try and establish in my own mind whether such line of precedent can be held not to violate the constitutional provisions guaranteeing free speech and a free press.
'The union labor cause, it seems to me, is one for the spreading of a propaganda rather than for the conduct of what might be called a business. ' It is very analogous in its principal aspects with the abolitionist movement that took place before the Civil War, when the South looked upon that cause as-an unlawful conspiracy both against government as well as against the business, and property interests of the South, and the passage of laws to prohibit the circulation of abolition literature was most seriously discussed.
By Section 11 of Article I of the present Ohio Constitution, it is provided:
*176 “Every citizen-may freely speak, write and publish his senti- ' ments on all subjects, being responsible for the abuse of the right. ” * * *
In the Constitution of 1802 of this state, Section 6, Article VIII, reads:
“Evéry citizen has an indisputable right to speak, write or print, upon any subject, as he thinks proper, being liable for the abuse of that liberty.”
It is obvious a man can not be called upon to respond for the abuse oi a privilege until after ah abuse has been committed. The question raised, therefore, is, how can a court, in the face of what might be said to be such a plain provision permitting a citizen to say or print anything, issue an order restraining in advance what shall be said or printed and published. If this right is absolutely unqualified, then this court is without power to issue an injunction that would operate to prohibit the doing of such acts, and the following illustrative cases seem to so hold: Clothing Co. v. Watson, 168 Mo., 133; Lindsay v. Montana Federation of Labor, 96 P., 127, 131.
The case of Clothing Co. v. Watson is the leading ease against the issuance of an injunction in a ease as at bar, but even in that jurisdiction the case is limited by the case of Door Co. v. Fuelle, 215 Mo., 421, 472.
But there are other provisions of our Constitution that should be looked at. Section 1 of Article I reads as follows:
“All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and liberty.”
By Section 16 of Article I it is provided:
“All the courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law; and justice administered without denial or delay.”
Section 20 of Article I also says;
*177 “This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated, remain with the people.”
It is not at all certain that the last clause of Section 20 so qualifies the first clause as to make the whole section merely a qualification of the powers granted to the state government. Is it not just as logical to say that in the adoption of the Constitution the rights declared to the citizen should be qualified, if necessary, to protect other rights also declared, as in Section 1, or possibly even not mentioned ? Certainly it is difficult to logically contend that the,rights of life, liberty and property secured by Section 1 and the right to appeal to the courts for the protection thereof including a court of equity as in ease at bar, as provided by Section 16, aré any lesser rights than that of the right of free speech. Yet in the case of mere reputation endangered by the publication of libels or slander, it would seem as though the right of free speech is a superior right. 22 Cyc., 900, and cases cited.
Is there a similar inferiority of the right of property to the conflicting right of freedom of speech and the press? The weight of authority shows that where speech or printed matter is published more in the nature of acts than as expressions of sentiments and such acts are part of a design or conspiracy to injure property rights, then an injunction may issue. See the following cases where the right to an injunction is recognized in cases such as at bar to protect a business against verbal threats or printed publications designed to further a conspiracy to boycott or intimidate. Gompers v. Bucks Stove & Range Co., 221 U. S., 418, 439: M. Steinert & Sons Co. v. Tagen, 32 L. R. A. (N. S.), 1013 (Mass.), and cases in note.
To protect rights under union labels: Union v. Lindner, 2 N. P., 114 (3 O. D., 244); Martin on Labor Unions, Section 374.
To protect against blacklisting of working men: Cornellier v. Haverhill Shoe Mfg. Assn., 221 Mass., 554, 560.
To protect against exposure of trade secrets and inducing breach of contracts: Vulcan Detinning Co, v. American Can Co., *178 12 L. R. A. (N. S.), 102 (N. J. Eq.); Kinney v. Scarborough Co., 40 L. R. A. (N. S.), 473 (Ga.); Tube Co. v. Tube Co., 3 C.C. (N.S.), 459 (affirmed, no rep., 69 O. S., 560).
To protect trade-marks and against unfair trade -. Medicine Co. v. Glessner, 68 O. S., 337.
It is true that in some of such cases the question of the constitutional provisions covering free speech and press were not raised, and it must be recognized that a mere incidental injury to property is not sufficient to warrant the granting of an injunction. Willis v. O’Connell, 231 Fed., 1002.
Is there reason in fact, historical or inherent, for this distinction, for some distinction between the right to be protected in one’s reputation and the right to have protection for one’s property ? Certainly if there is, a nisi prius court should follow the weight of accepted precedent.
'These constitutional expressions in question were originally formulated at the beginning of government in this country under written constitutions; and probably, ás is admitted generally by those contending for the most unfettered right of free speech, the law as it stood at such time in many respects, unjustly, as most of us now think, emphasized the protection of property more than what might be called personal rights.
'Again, it is an obvious fact of history that the acceptance of the principles of free speech and a free press'was based on political, rather than social or economic ideas. It was at this early time, as it is now, almost impossible to draw a line where the free discussion of a man’s character or reputation should end, and still continue the principle that a democratic government must have as, one of its supports the right of, any citizen to freely discuss, without previous censorship, the acts, reputa^ tion.or character of .all those who'take part in thát government) which, at least theoretically, means all pérsons. ' ...
This reason does not apply to verbal or written acts designed to effect an injury to one’s property, though it must be admitted in many eases the utterance of slander or)libel of a, man’s reputation is more injurious to)him than injury to his prop *179 erty would be, and may at the same time injure his property rights as well. And yet such acts, though affecting one’s reputar, tion, can not destroy character, which is fixed by nature or is the' result of a person’s own molding. It might be argued that the truth, in most eases, will usually be known to a person’s assosiates, or will eventually become known to cure in many cases the effect of false reports; while in the case of property lost or destroyed it can not be replaced; and where damages are incapable of legal measurement, or where the slanderer is irresponsible, the damage to property would be irreparable. Emaich v. Kane et al, 34 Fed., 46. Where threats and libels are substantially limited to their effect and purposes to damage to property, as distinguished from personal reputation, the issuance of an. injunction against the making thereof can, to such extent at least, be distinguished from the case where an injunction is. refused for the protection of mere reputation.
The constitutional provisions in question must be accepted in the light of what the people adopting those constitutions must have considered the language thereof to men at the time in which such provisions were formulated. State v. Wing, 60 O. S., 407, 420.
The best definition contemporary with the original formulation of such constitutional principles that'the court has been able to find is in the case of People v. Croswell, 3 Johnson’s Cases, 337, where the newspaper libeling of President Jefferson was concerned. Chancellor Kent, in'his opinion, adopts the definition made by Alexander Hamilton in his argument of the case, and uses the following language:
“Liberty of the press.consists in the right to publish with imr punity, truth with good motives and for justifiable ends, whether it respects gpvernment, magistracy or individuals. ”
It is seen that this definition does not concede .the right to threaten, slander or libel, except for justifiable ends.
However, I am satisfied that an injunction can issue in .’this case that-will not violate the provision's-of the Constitution in *180 question, and yet prohibit the unlawful acts in question, namely, an injunction prohibiting the defendants Baumgartner, Kennedy, Brown and Langley, and such others who may be shown to have used threats, violence or other means of intimidation, from continuing to make threats or distribute scab circulars “for the purpose of intimidating or encouraging the doing of violence in furtherance of the unlawful purposes,” etc. Any violation of such order would make the defendant subject thereto guilty of contempt of court on proof of the guilty purpose or intent coupled up with the fact, and relieve from liability where an act is shown to have been within his constitutional rights.
A somewhat similar order was issued in the case of Swift & Co. v. U. S., 196 U. S., 375, 393, 401.
Counsel may prepare a decree in conformity herewith.