MARX & HAAS JEANS CLOTHING COMPANY, Appellant, v. WATSON et al.

In Banc, March 29, 1902,

1. **Appellate Jurisdiction:** TEST: ALLEGATIONS OF PETITION. An allegation in a verified petition for an injunction that plaintiffs, if defendants be not restrained, will be damaged in excess of $10,000, is sufficient to confer jurisdiction of an appeal in such case on the Supreme Court; the test being the value in money of the relief afforded either party, should it be granted or denied.

2. **Constitutional Law:** FREEDOM OF SPEECH AND PRESS: BOYCOTT: INJUNCTION. Under section 14 of the Bill of Rights, guaranteeing

to every person freedom "to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty," and section 30, providing "that no person shall be deprived of life, liberty or property without due process of law," which likewise impliedly guarantees freedom of speech, the right to speak, write and publish, is absolutely privileged against interference therewith by injunction, and its exercise for the purpose of boycotting the business of individuals can not be restrained, though the privilege is abused, and plaintiffs, owing to the insolvency of defendants, are without an adequate remedy at law. Injunction and freedom of speech can not coexist; wherever injunction *begins*, there free speech *ends*. And the remedy by injunction is not enlarged or in any manner affected by reason of the financial condition of the persons sought to be restrained of their right of freedom of speech, since the Constitution is no respector of persons, and the poor man is no more liable to be enjoined than the wealthiest man in the community. These observations are, however, made in the case of a *peaceable* boycott, where there are no circumstances of personal intimidation or threats of destruction of property. (ROBINSON, J., dissenting.)

Appeal from St. Louis City Circuit Court.—*Hon. Leroy B. Valliant,* Judge.

AFFIRMED.

*Walter D. Coles,* with whom is *Silas B. Jones,* for appellant.

The money value of the injunctive relief asked by appellant is not susceptible of definite ascertainment, but as the petition alleges that appellant will "suffer damages . . . in excess of ten thousand dollars" if the respondents are permitted to do the acts sought to be enjoined, and as the evidence tends strongly to sustain such allegation, this court has jurisdiction to determine this case upon appeal. Gast Bank Note Co. v. Fennimore Ass'n, 147 Mo. 557; Evans & Howard Co. v. Smelting Co., 48 Mo. App. 636; Gartside v. Gartside, 42 Mo. App. 513; Railroad v. Watson, 64 Mo. App. 465. A court of equity will intervene by injunction to prevent injury to one's

lawful business by the wrongful conduct of others, in cases where the injury threatened can not be 'fully compensated in an action at law or where the wrong is of a continuing character, such as will necessitate, for its redress, a multiplicity of suits. Shoe Co. v. Saxey, 131 Mo. 212. It is now firmly established by a long line of decisions, both in the State and Federal courts, that a "boycott"—as practiced by respondents in this case—is an unlawful form of intimidation and coercion, which, when injury results therefrom, a court of equity will prevent by injunction. Barr v. Essex Trade Council, 53 N. J. Eq. 101; Beck v. Ry. Teamster Protective Union, 118 Mich. 497; Plant v. Wood (Mass.), 57 N. E. 1011; Sherry v. Perkins, 147 Mass. 212; Vagelohn v. Guntner, 167 Mass. 93; Hopkins v. Oxley Stave Co., 83 Fed. 912; Brace Bros. v. Evans (Pa.), 3 Ry. & Corp. L. J. 561; Moores v. Bricklayer's Union, 23 Weekly Law Bulletin (Ohio), 48; Doremus v. Hennessy, 176 Ill. 608; State v. Glidden, 55 Conn. 50; Crump v. Commonwealth, 84 Va. 927; Wright & Co. v. Hennessy, 52 Albany Law Journal 104; Commonwealth v. Shelton (Va.), 11 Va. L. J. 329; People v. Wilzig, 4 N. Y. Crim. Rep. 403; Casey v. Typographical Union, 45 Fed. 135; Steamship Co. v. McKenna, 30 Fed. 48. The English decisions are to the same effect. Trollope v. Trades Federation, 11 Times Law Rep. 280; Spinning Co. v. Riley, L. R. 6 Eq. 558; Temperton v. Russell, 1 Q. B. 715. Not only is a "boycott" a civil wrong, but it has been repeatedly held to be a criminal conspiracy at common law. State v. Glidden, 55 Conn. 50; Crump v. Commonwealth, 84 Va. 927; Commonwealth v. Shelton, 11 Va. L. J. 329; People v. Wilzig, supra; State v. Stewart, 59 Vt. 273; Reg. v. Bunn, 12 Cox Cr. Cases 316; Rex v. Ferguson, 2 Starkie 489.

*William B. Thompson* and *Francis A. Thornton* for respondents; *Lee Meriwether* of counsel.

(1)   The circular published by the defendants, and the words therein contained, must, after all, fix the character of the acts done or intended to be done, and they amount to no actionable wrong.   These actions done, and intended to be done, as contained in the circular, could not of themselves constitute conspiracy, nor could they be made an actionable wrong by reason of the charge that the acts done, or intended to be done, were maliciously done, or in pursuance of any conspiracy. Allen v. Flood, A. C. 1; United States v. Kane, 23 Fed. 750; O'Callahan v. Cronin, 121 Mass. 114; Hunt v. Simonds, 19 Mo. 583; Payne v Railroad, 81 Tenn. 507; Steamship Co. v. McGregor, 23 Q. B. D. 598; Cooley on Torts, 635; Stevenson v. Newham, 13 C. B. 297; Heald v. Carey, 11 C. B. 993; Heywood v. Tillson, 75 Maine 225; 18 Cent. Law Journal, pp. 424, 427.   (2)   To maliciously conspire to do an injury to another is no more actionable than to maliciously intend to injure another, unless some overt act of itself unlawful is done towards the completion of the design.   Bigelow, Leading Cases on the Law of Torts, p. 207; Hutchins v. Hutchins, 7 Hill 104; Payne v. Railroad, supra; Cooley on Torts, pp. 278, 688; Stevenson v. Newham, 13 C. B. 285; Jenkins v. Fowler, 24 Pa. St. 308; Heywood v. Tillson, supra; 2 Greenleaf Ev., sec. 453; Mayor of Bradford v. Pickles, A. C. 597.   (3)   There is nothing in the evidence in this case to show that the act done, or attempted to be done, for which the restraining order was issued, amounted to a legal injury, and the charge of bad motive would not make wrongful an act which is in itself not wrongful, or an act which does not amount to a legal injury can not be actionable because it is done with a bad intent.   Allen v. Flood, supra; Heald v. Carey, 11 C. B. 993; Brinsmead v. Harrison, L. R. 7 C. P. 554; Stevenson v. Newham, supra; Mayor of Bradford v. Pickles, supra; Hunt v. Simonds, 19 Mo. 583; Heywood v. Tillson, supra; Alexander v. Relfe, 9 Mo. App. 133; Mfg. Co. v. Hollis, 54 Minn. 223; Norcross v. Otis, 152 Pa. St. 481;

Spalding v. Vilas, 161 U. S. 483; Land Co. v. Hudson Com.
Co., 138 Mo. 439; Cooley on Torts (2 Ed.), 81 and 688;
Chatfield v. Wilson, 28 Vt. 49; Payne v. Railroad, supra;
Rideout v. Knox, 148 Mass. 368; Rich v. Railroad, 87 N. Y.
394; Boyson v. Thorn, 98 Cal. 598; Kelley v. Railroad, 93 Ia.
436; Wood on Nuisance (2 Ed.), secs. 6 and 642; Lumley
v. Gye, 2 E. and B. 247; May v. Wood, 172 Mass. 14.

SHERWOOD, J.—The plaintiff company sought to en-
join defendants from declaring or enforcing a boycott against
it to the injury of its business, by inducing its customers,
and others who might become such, from dealing with it for
its productions. To carry through the boycott (as it is termed)
into effect, the following circular was issued and freely circu-
lated by defendants:

"Headquarters of Joint Executive Board of L. A. 993,
    Knights of Labor, Local Union 129, United Garment
    Workers of America, Affiliated with the American Fed-
    eration of Labor, St. Louis, Mo., April, 1898.
    "A few reasons why a boycott has been placed against the
firm of Marx & Haas, manufacturers of jeans clothing and the
Jack Rabbit pants, St. Louis, Mo.:
    "This trouble between the clothing cutters of St. Louis
and the firm of Marx & Haas originated as far back as Septem-
ber, 1895, when the clothing cutters were all in one labor or-
ganization, namely, the Knights of Labor, which trouble at
that time culminated in a boycott being placed against the
firm by the Knights of Labor. The firm, in order to counter-
act the boycott, which was doing their business a great deal of
injury, evolved a, scheme which they knew would have the
desired effect, if carried out successfully. This was nothing
less than the organization of a rival union, and so, by threats
of discharge for non-compliance with their demands, promises
of increase in wages, steady work all the year around, and the

payment of all expenses, they finally induced the men em-
ployed in their shops to organize a local union of the United
Garment Workers of America.    Now, let us see how well they
kept their promises.

"In the spring of 1896, instead of the steady work which
they had promised, they laid the men off from three to six
months, and in December of the same year, after keeping the
men idle for this length of time, and knowing they were prac-
tically forced to accept whatever terms they might dictate, they
reduced their wages from ten to fifteen per cent, and increased
the amount of work required.    In May, 1897, they again
reduced the men's wages from twenty-five to thirty-five per
cent.    This last reduction brought the men to a realization of
their helpless condition, and so they made overtures to the
Knights of Labor for a union of forces, which was finally
effected, and while the two organizations maintain their sep-
arate unions, they work in harmony on all trade matters, and
have the hearty approval of the general officers for their action.
Immediately after the reunion a schedule of work and wages
was submitted to the firm, and after considerable trouble it was
accepted by the firm, but was in force but a short time when
the firm again violated its signed and sealed contract; the
organization decided to let the matter rest until the expiration
of their contract, which took place on January 1, 1898.    Im-
mediately after the above date, we presented another schedule
of work and wages, which the firm could not misconstrue, as
they had done with former schedule.    After waiting for sev-
eral weeks for a decision from the firm, which was withheld
on one pretense or another, the organization finally decided
to inform the firm that the schedule submitted by the organiza-
tion would go into effect on and after Tuesday, March 23,
1898; for answer to this the firm presented a schedule to the
committee who waited on them, which was so outrageously
high that no man could do the work were he ever so willing.
The committee were also informed by Mr. H. Marx, the presi-

dent of the firm, that 'any g—d d—n man who would not work according to his schedule would be kicked out of his shop, and he would let the whole business go to h—l before he would work by any g—d d—n schedule but his own!' The committee made a verbatim report of their visit to the firm to the joint organization, who immediately rejected the firm's schedule, and issued instructions to the men employed by the firm to work according to their own schedule from the date set by the organization. For carrying out the laws of the organization four of the men were discharged, the first two being officers of the organization, the firm thinking that if they got rid of the agitators, as they called them, the rest of the men would continue to submit to the inhuman treatment they had been receiving for the past three years.

"You will see from the above statement of facts what an unscrupulous firm this is; we are positive we have proven to you the justice of our position, and we hope it will not be necessary to inform the labor and reform organizations with which we are affiliated who are in your locality as we are satisfied we have convinced you that the stand we have taken in this case is a just one, and will command the support of all fair-minded men. We therefore request you to write to Messrs. Marx & Haas and inform them that you would request them to settle the dispute with their employees, or otherwise you can not afford to handle their goods as long as they are antagonizing organized labor, who are your friends and customers; by doing this you will aid us in getting simple justice from this more than unfair firm. Should this firm make a settlement with us you will be informed of the fact under the seals of the joint organizations. Until such time we trust there will be no report made to our office that Marx & Haas have shipped you any more goods.

"Kindly inform us what action you take in this matter; and any further information you may desire will be cheerfully

furnished by writing to Headquarters of Joint Executive Board, No. 911 Pine street, St. Louis, Missouri.

"[SEAL.]                                    [SEAL.]"

Supplemental to this circular, committees were appointed to wait upon various merchants in St. Louis and vicinity and inform them of the trouble existing between the Marx & Haas Company and its employees, and request their assistance in the cause of the employees by refusing to deal further with Marx & Haas during the pendency of the trouble. In some instances, as appeared in the evidence at the trial, threats were made by members of these committees that the patronage of the boycotters and their friends would be withheld from certain merchants unless they discontinued their business dealings with the plaintiff corporation; but in no instance were there threats made of any resort to violence or unlawful intimidation. The threats were always and solely threats of a mere withholding of trade relations by the boycotters and those acting with them; no intimidation through fear of personal violence, or of the destruction of property; nothing but the mere abstaining from business relations with them and the persuasion of others to do likewise.

The plaintiffs' petition concludes with the prayer:

"That the defendants, their associates, confederates, agents and representatives be enjoined and restrained by a temporary order of injunction, to be made final upon the hearing of this cause, from boycotting or making effectual, promulgating or in anywise proclaiming any boycott upon or against the plaintiff or its goods, and from sending, conveying or delivering in any way, to any person, firm, corporation or association, any boycott notice, verbal or otherwise, referring to the plaintiff or its goods, and from in any way menacing, hindering or obstructing the plaintiff from the fullest enjoyment of all the patronage, business and custom which it may possess, enjoy or

acquire, independent of the action of the said defendants or any of them."

The answer of Brining was a general denial. The answer of the other defendants is a general denial, and contains other defenses.

The point of difference, it seems, from the answer, which gave origin to this litigation, consisted in the difference in the schedules either party insisted on, respecting the number of double layers of cloth that would have to be cut by one operation of the machine and also sectionized with the knife; plaintiff insisting on a larger number being thus cut with the machine and sectionized with the knife; defendants on a less number.

After setting out the varying number of layers of different kinds of cloth required to be cut by the old schedule and the new, and showing the excess of thickness under the latter, the answer proceeds;

"This means double layers of cloth—or from 48 to 120 layers of cloth according to material, to be cut at one operation of the new machine. The machine is fixed at one end of a table forty-five feet long—and the cloth stretched in layers 120 in number, the length of the table making 1,800 yards on the table when 60 pairs are cut. This cloth weighs about one-third of a pound to the yard, or 600 pounds in the 1,800 yards. It being impracticable to draw such a weight to the new machine which is fixed, and to manipulate it so as to make the band saw of the machine follow the outlines of the garment to be cut, it is necessary to section it with a knife by hand, cutting through 120 thickness of cloth—about five and one-half to six inches—at one operation, a labor of great difficulty, and ruinous to the hand, when continued any length of time, and this, plaintiff insisted its employees should do, without offering one cent of additional compensation for the greatly increased labor and severity to the hand. Even with the lighter schedule of January 17, 1898, the labor is great, and

injury to the hand is severe, causing painful bruises and carbuncles.

"With the new machine and greatly increased number of layers of cloth required by plaintiff, not only is the labor more than double without any increase of compensation, but the injury to the employee's hand is so great as would, in a few weeks, disable and compel him to cease from such labor. Plaintiff sought to obtain all the benefit of increased production without any increased compensation to the employee—utterly regardless of the increased severity of the labor extorted from him, and the pain and suffering inflicted, and without any benefits to the,public by reduction in prices, which it hypocritically claims, and invokes the powers of the court to enable it to maintain and enforce its oppressive and heartless exactions.

"Defendants say there was and is no objection to the use of said machine under a reasonable schedule, but those of defendants employed as cutters did refuse, for the reasons above stated, to work under the excessive, unconscionable, and unreasonable schedule proposed by plaintiff on March 16, 1898, and for this were discharged by plaintiff in terms of the vilest abuse."

The answer then denies any confederation or conspiracy to coerce or intimidate the customers of plaintiff from doing business with plaintiff.

Defendants then "say that they have, as they are advised they have a perfect right to do, made and published a truthful statement of their grievances against plaintiff, and endeavored to persuade plaintiff's customers and others, not to buy any goods from plaintiff, till plaintiff righted the wrong it had done to defendants—acts of repeated bad faith and oppression going back as far as 1895."

The testimony of H. N. Marx supports the theory that the sectionizing to be done with the knife was much more severe on the hands, owing to the increased number of thick-

nesses of cloth, when done under the new schedule plaintiff insisted on, than when done under the old schedule under which defendants had been working. And the witness virtually, though evasively, admitted that their employees complained to him that their hands would be ruined if required to work under the new schedule. Defendants introduced no evidence. At the close of the testimony, the lower court dissolved the temporary injunction previously granted, and entered a decree dismissing plaintiff's petition—hence this appeal.

1.    Some question seems to have been raised in Division One of this court, whether jurisdiction of this cause belonged to this court, and the matter is mentioned in plaintiff's supplemental brief.

The allegation is made in the petition and verified by affidavit that if defendants be not restrained, as prayed, plaintiff will be damaged in excess of $10,000. This is sufficient to show jurisdiction in this court. The test is the value in money of the relief afforded plaintiff should the relief prayed for be granted, or *vice versa,* should the relief be denied. [Evens & Howard Fire Brick Co. v. St. Louis Smelting & Ref. Co., 48 Mo. App. 634; Gast Bank Note & L. Co. v. Assn., 147 Mo. 557]

2.    The next point for consideration is the sufficiency of the petition to authorize the granting of injunctive relief when viewed from a constitutional standpoint. Our statute (section 602, Revised Statutes 1899) provides that two objections to a petition can not be waived, one that "the court has no jurisdiction over the subject-matter of the action;" the other, "that the petition does not state facts sufficient to constitute a cause of action." Such a defect is radically erroneous and incurable even though not raised in the court below. [Weil v. Greene Co., 69 Mo. 281, and cas. cit., and many subseq. cas.]

Section 14 of our Bill of Rights declares that "no law shall be passed impairing the freedom of speech; that every

person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." The evident idea of that section is *penalty* or *punishment, and not prevention.* Because, if *prevention* exists, then no *opportunity* can possibly arise for one becoming responsible by saying, writing or publishing "whatever he will on any subject." The two ideas, the one of absolute freedom "to say, write or publish whatever he will on any subject," coupled with responsibility therefor, and the other idea of *preventing* any such free speech, free writing or free publication *can not coexist.*

And just here it must be observed that the right of free speech, free writing or free publication, were not *created* by the Constitution which recognizes those rights as now existing, and only seeks their protection and perpetuation. [Cooley's Const. Lim. (6 Ed.), 511, et seq.] That instrument simply forbids *any law* to be passed impairing the freedom of speech, and then gives a general and perpetual guaranty against any interference *from any quarter whatever,* with the freedom of every person "to say, write or publish whatever he will on any subject." Language could not be broader, nor prohibition nor protection more amply comprehensive.

Wherever within our borders speech is uttered, writing done, or publication made, there stands the constitutional guaranty giving staunch assurance that each and every one of them shall be *free.* The Legislature can not pass a law which even *impairs* the freedom of speech; and as there are no exceptions contained in the rest of the quoted section, the language there used stands as an *affirmative prescription* against any exception being thereto made, as effectually as if words of *negation* or *prohibition* had *expressly* and *in terms, been employed.*

As Denio, C. J., aptly says: "But the affirmative prescriptions, and the general arrangements of the Constitution, are far more fruitful of restraints upon the Legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the pur-

Clothing Co. v. Watson.

pose of that provision." [People v. Draper, 15 N. Y. 544.]

And THOMPSON, C. J., touching the same point, observes: "The expression of one thing in the Constitution, is necessarily the exclusion of things not expressed. This I regard as especially true of constitutional provisions, declaratory in their nature. The remark of Lord BACON, 'that, as exceptions strengthen the force of a general law, so enumeration weakens, as to things not enumerated,' expresses a principle of common law applicable to the Constitution, which is always to be understood in its plain, untechnical sense. Commonwealth v. Clark, 7 W. & S. 127." [Page v. Allen, 58 Pa. St. 338.]

Besides, section 14, aforesaid, is, as before stated, *part and parcel of the Bill of Rights,* and Judge COOLEY, when speaking of that portion of a Constitution which bears such designation, says: "It is also sometimes expressly declared— what indeed is implied without the declaration—that everything in the declaration of rights contained is excepted out of the general powers of government, and all laws contrary thereto shall be void. . . . While they continue in force they are to remain absolute and unchangeable rules of action and decision." [Cooley's Const. Lim. (6 Ed.), p. 48.]

The rights then set forth and designated in section 14 are *"excepted out of the general powers of the government;* all laws contrary thereto are void, and so long as such provisions of the Bill of Rights continue in force they remain absolute and unchangeable rules of action and decision." And, as the learned author and eminent jurist just quoted says in another place with great force: "The securities of individual right . . . can not be too frequently declared, nor in too many forms of words; nor is it possible to guard too vigilantly against the encroachments of power, nor to watch with too lively a suspicion the propensity of persons in authority to break through the 'cob-web chains of paper Constitutions.'" [2 Story's Const. (Cooley's Ed.), sec. 1938.]

Vol 168 mo—10.

Nor is it to be forgotten that the right of free speech is also impliedly guaranteed in another section of the Bill of Rights, section 30, to-wit: "That no person shall be deprived of life, liberty or property without due process of law." In other words, *free speech* is as an inevitable concomitant and adjuvant of *personal liberty,* as necessary to the *latter's existence, as vital air to the lungs, or locomotion to the body.* Speaking of section 30, this court, on a former occasion, has said: "The rights thus guaranteed are something more than the mere privileges of locomotion; the guarantee is the negation of arbitrary power in every form which results in the deprivation of a right. These terms, 'life,' 'liberty' and 'property,' are representative terms and cover every right to which a member of the body politic is entitled under the law. Within their comprehensive scope are embraced the right of self-defense, freedom of speech, religious and political freedom, exemption from arbitrary arrests, the right to buy and sell as others may—all our liberties—personal, civil and political; in short, all that *makes life worth living;* and of none of these liberties can anyone be deprived, except by due process of law." [State v. Julow, 129 Mo. loc. cit. 172-3.]

The probable reason why the rights of free speech, free writing and free publication were mentioned *in terms* in our organic law is that in the mother country from whence our institutions were derived, there was scant regard paid to those rights in that country, and a censorship existed over the press, and publication without permission was punished as criminal; and various annoying restrictions over free speech existed; and men were punished by imprisonment for offensive words spoken in debate, *even in Parliament.*

In California the provisions of the Constitution on the point in hand are similar to our own, thus: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of

the press." [Art. 1, sec. 9.] And in that State this cause arose: One Durrant was upon trial in the city of San Francisco, charged with murder, and while the jury were being impaneled, the petitioner, Dailey, advertised by posters and newspapers that he would produce in a certain theatre in said city a play entitled "The Crime of a Century." Durrant presented an affidavit to the court wherein his trial was then pending, setting forth that said play was based upon the facts of his case and would deprive him of a fair and impartial trial, etc. The court made an order directing Dailey to desist. On review by the Supreme Court this was held to be an infringement of the constitutional right freely to speak and write. [Dailey v. Superior Ct., 112 Cal. 94.] And the order made, was annulled on certiorari, the ruling being based on the constitutional provisions above quoted. GAROUTTE, J., who delivered the opinion of the court in banc, in the course of it observed: "The wording of this section is terse and vigorous, and its meaning so plain that construction is not needed. The right of the citizen to freely speak, write, and publish his sentiments is unlimited, but he is responsible at the hands of the law for an abuse of that right. He shall have no censor over him to whom he must apply for permission to speak, write, or publish, but he shall be held accountable to the law for what he speaks, what he writes, and what he publishes. It is patent that this right to speak, write, and publish, can not be abused until it is exercised, and before it is exercised there can be no responsibility. The purpose of this provision of the Constitution was the abolishment of censorship, and for courts to act as censors is diretly violative of that purpose." Cited, 6 Am. and Eng. Ency. of Law (2 Ed.), 1003.

A similar case arose in this State, that of Life Association of America v. Boogher, 3 Mo. App. 173, where the plaintiff sought to enjoin the publication of a libel. The lower court on demurrer held that the petition stated no ground for relief, and this judgment was affirmed in the Court of Appeals,

GANTT, P. J., observing: "Enough is stated to inform us that defendant has uttered a malicious, false, scandalous, and libelous statement respecting the plaintiff, and that with the purpose of inflicting injury on the plaintiff, defendant proposes and threatens to repeat and enlarge the wrong and injury already inflicted; that the resulting loss to the plaintiff will be great, and irreparable by civil action, because of the insolvency of the defendant; and thereupon the aid of a court of justice is claimed, to prevent that for which, if perfected, it can not give compensation.    It is obvious that, if this remedy be given on the ground of the insolvency of the defendant, the freedom to speak and write, which is secured, by the Constitution of Missouri, to all its citizens, will be enjoyed by a man able to respond in damages to a civil action, and denied to one who has no property liable to an execution. . . . In Missouri, where we are expressly forbidden by the Constitution to assume the power we are asked by the plaintiff to exercise, our answer can not be doubtful.    It is hardly necessary to quote the familiar language of our organic law, which has always declared 'that every person may freely speak, write, or print on any subject, being responsible for the abuse of that liberty.'    If it be said that the right to speak, write, or print, thus secured to every one, can not be construed to mean a license to wantonly injure another, and that by the jurisdiction claimed it is only suspended until it can be determined judicially whether the exercise of it in the particular case be allowable, our answer is that we have no power to suspend the right for a moment, or for any purpose.    The sovereign power has forbidden any instrumentality of the government it has instituted to limit or restrain this right except by the fear of the penalty, civil or criminal, which may wait on abuse.    The General Assembly can pass no law abridging the freedom of speech or of the press; it can only punish the licentious abuse of that freedom. Courts of justice can only administer the laws of the State, and, of course, can do nothing by way of judicial sentence

which the General Assembly has no power to sanction. The matter is too plain for detailed illustration. The judgment of the circuit court is affirmed, all the judges concurring."

Section 14, supra, makes no distinction and authorizes no difference to be made by courts or legislatures between a proceeding set on foot to enjoin the publication of a *libel,* and one to enjoin the *publication of any other sort or nature, however injurious it may be,* or to prohibit the use of free speech or free writing on any subject whatever; because wherever the authority of *injunction begins,* there the right of free speech, free writing or free publication *ends.* No halfway house stands on the highway between *absolute prevention* and *absolute freedom.* The rights established by section 14 can neither be impaired by the Legislature, nor hampered nor denied by the courts.

Nor does it in any way change the complexion of this case by reason of its being alleged in the petition "that the defendants and each of them is without means and has no property over and above the exemption allowed by law wherefrom the plaintiff might secure satisfaction for the damages resulting to it from the acts aforesaid." *The Constitution is no respecter of persons;* the impecunious man "who hath not where to lay his head," has as good right to free speech, etc., as does the wealthiest man in the community. The right to enjoin in the former's case is precisely the same as in the latter's; no greater and no less. In short, the exercise of the right of free speech, etc., is as *free from outside interference or restriction as if no civil recovery* could be had or *punishment inflicted because of its unwarranted exercise.*

And in this connection, it is to be constantly borne in mind that the principle is firmly rooted in equity jurisprudence, that though there be no remedy at law, this does not necessarily and of itself give a court of equity jurisdiction to afford relief. The authority to enjoin finds no better harbor in the empty pocket of the poor man than in the full pocket

of the rich man. And such authority to enjoin can have no existence in circumstances such as the present case presents, if the Constitution is to be obeyed.

If these defendants are not permitted to tell the story of their wrongs, or, if you please, their supposed wrongs, by word of mouth or with pen or print, and to endeavor to persuade others to aid them by all peaceable means, in securing redress of such wrongs, *what becomes of free speech, and what of personal liberty?* The fact that in exercising that freedom they thereby do plaintiff an actionable injury, such fact does not go a hair towards a diminution of their right of free speech, etc., for the exercise of which, if resulting in such injury, the Constitution makes them expressly responsible. But such responsibility is utterly incompatible with authority in a court of equity to prevent such responsibility from occurring.

We do not, of course, pass upon questions not involved in this record, such for instance as the power of a court of equity to enjoin the destruction of property, or threats to do so; threats from which present ability to be carried into execution amount to *verbal acts,* nor threats of personal violence made with the view to intimidate, in its ordinary sense, employers or their employees; but we do hold that upholding, as we must, the constitutional provisions heretofore quoted, the defendants can not be enjoined by a court of equity from exercising those rights of free speech, etc., guaranteed to them by the Constitution of this State.

Holding these views, we affirm the decree of dismissal entered in favor of defendants by the court below. *Burgess, C. J., Brace, Marshall* and *Gantt, JJ.,* concur; *Robinson, J.,* dissents; *Valliant, J.,* not sitting.