[L. A. No. 17903. In Bank. July 2, 1942.]

MAGILL BROS., INC. (a Corporation), Appellant, v. BUILDING SERVICE EMPLOYEES' INTERNA-TIONAL UNION (an Unincorporated Association) et al., Respondents.

Pierson & Block, R. K. Pierson and Samuel P. Block for Appellant.

Ben Koenig, Aaron B. Rosenthal, George Olshausen, Jonathan Rowell and Mathew O. Tobriner for Respondents.

GIBSON, C. J.—The plaintiff corporation, which is engaged in operating two bowling alleys in the city of Los Angeles, brought this action against the defendant unions and the officers and members thereof. Plaintiff sought to enjoin defendants from maintaining pickets in front of plaintiff's places of business and to recover damages for the allegedly unlawful picketing previously carried on by defendants. The action was tried without a jury and, by stipulation, was tried solely with reference to the alley located at 1953 S. Vermont Avenue in Los Angeles. The trial court found that prior to the filing of the complaint in this action none of plaintiff's employees was engaged in a labor dispute with his employer and that there was no strike of any nature against plaintiff. It found that Local 214 sought to unionize all of plaintiff's employees who were not members of any union and that Local 214 urged plaintiff to sign a contract providing that it would employ only union members. After repeated refusals on the part of plaintiff to sign such a contract (on the theory that it would not force its employees to become union members), defendants stationed pickets outside the bowling alley who carried signs stating: "This house on strike. A. F. L." At that time, according to the findings of the trial court, none of plaintiff's employees was on strike and no labor dispute existed between employer and employees. Immediately after the establishment of the picket line, however, certain of plaintiff's employees left and remained away from their work. The court found that prior to the establishment of the picket line a ballot was conducted by defendants among those of plaintiff's employees who belonged to the union. The question voted upon was whether a strike should be called against plaintiff but not a single employee (with one possible exception) voted for such a strike. It was found that the sole purpose of the picketing was to compel plaintiff to sign the closed shop agreement and that "the banners and signs carried by said pickets conveyed false and untrue information to the general public insofar as the employees of plaintiff are concerned." The trial court found that the allegations of the complaint charging that the pickets had engaged in acts of force, violence or physical intimidation were untrue. It also found that the allegations of damage in the sum of $25,000 were untrue.

Upon the basis of these findings the trial court rendered a

so-called "memorandum for judgment" in which it ordered that the injunction be granted on the ground that picketing was unlawful in the absence of a labor dispute between the employer and its employees. Following the decision of this court in *McKay* v. *Retail Auto S. L. Union No. 1067*, 16 Cal. (2d) 311 [106 P. (2d) 373]), and companion cases, defendants moved to vacate the order previously made by the trial court. This motion was granted and thereafter judgment was entered for defendants denying the permanent injunction and dissolving the preliminary injunction theretofore granted. Plaintiff brings this appeal from the judgment for defendants.

The question for decision is whether, under the facts found by the trial court, it was error to deny plaintiff's request for injunctive relief. Plaintiff concedes that under controlling decisions no injunction could have been granted based upon the absence of a dispute between the employer and his employees (*McKay* v. *Retail Auto. S. L. Union No. 1067, supra*, P. 324; *C. S. Smith Metropolitan Mkt. Co.* v. *Lyons*, 16 Cal. (2d) 389, 394 [106 P. (2d) 414]; *American Federation of Labor* v. *Swing*, 312 U. S. 321 [61 S. Ct. 568, 85 L. Ed. 855]; *Bakery and Pastry Drivers and Helpers, etc.,* v. *Wohl* — U. S. — [62 S. Ct. 816, 86 L. Ed. —]), or upon the ground that the picketing was being conducted to secure a closed shop contract. (*McKay* v. *Retail S. L. Union No. 1067, supra*, p. 322-323; *Shafer* v. *Registered Pharmacists Union*, 16 Cal. (2d) 379 [106 P. (2d) 403].) The sole issue, therefore, is whether the trial court erred in denying injunctive relief in a case where it found that the banners and signs carried by the pickets conveyed false and untrue information to the general public.

There can be no doubt that untruthful picketing is unlawful picketing. Cases involving the right of labor to picket peacefully have consistently held that the picketing must also be honest and truthful. (*McKay* v. *Retail Auto. S. L. Union No. 1067, supra*, p. 319-320; *Steiner* v. *Long Beach Local No. 128*, 19 Cal. (2d) 676, 682-683 [123 P. (2d) 20]; *Euclid Candy Co.* v. *International Longshoremen*, 49 Cal. App. (2d) 137, 143 [121 P. (2d) 91]; cf. *Davitt* v. *American Bakers' Union*, 124 Cal. 99 [56 Pac. 775]; *Weist* v. *Dirks*, 215 Ind. 568 [20 N. E. (2d) 969, 971); *Wilner* v. *Bless*, 243 N. Y. 544 [154 N. E. 598]; *Olympia Operating Co.* v. *Costello*, 278 Mass. 125 (179 N. E. 804]; 1 Teller, Labor Disputes and Col-

lective Bargaining (1940), § § 126-128, pp. 388, et seq.) In certain cases it has been difficult to determine whether the particular signs used in picketing were actually false (cf. Teller, *op. cit. supra;* (1941) 29 Cal. L. Rev. 366, 370, n. 12), but since there is no challenge to the trial court's finding upon this point it is unnecessary in the present case to consider the question. Conceding, in effect, that the picketing in the present case conveyed false information to the public, defendants contend that the action of the trial court should be sustained upon the ground that equity will not enjoin picketing under such circumstances because it is so closely identified with the constitutional right of free speech. In support of this proposition defendants rely upon cases which set forth the principle that equity will not grant injunctive relief against the publication of what might be, after publication, a libel or slander. (*Dailey* v. *Superior Court,* 112 Cal. 94 [44 Pac. 458, 53 Am. St. Rep. 160, 32 L. R. A. 273] ; *In re Wood,* 194 Cal. 49, 60 [227 Pac. 908) ; cf. *People* v. *Armentrout,* 118 Cal. App. (Supp.) 761, 769 [1 P. (2d) 556] ; *Goldberg, Bowen & Co.* v. *Stablemen's Union,* 149 Cal. 429, 434 [86 Pac. 806, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460].) Defendants' position in this regard cannot be sustained. If defendants had remained at home and had uttered false statements concerning plaintiff, the rule cited might have been relied upon. Not so in the present case, however, for, assuming that the rule is correct, here is not the utterance of false statements which is sought to be enjoined, but the conduct of picketing in an unlawful manner. The rule in this regard is analogous to the principle that while equity will not ordinarily enjoin activity which is criminal in nature, neither will it refuse to act where an independent ground for relief is presented merely because the acts sought to be enjoined are also criminal. (See 5 Pomeroy, Equity Jurisprudence (Equitable Remedies, (2d ed.) §2050, p. 4630.) Despite theoretical criticism (see 1 Teller, *op. cit. supra,* p. 404; (1941) 29 Cal. L. Rev. 366, 377-378) and despite the fact that the publication of false statements alone will not justify equitable relief, it is the nearly unanimous rule throughout the country that equity will intervene where false or fraudulent statements are combined with picketing and where, under local policy, this renders the picketing illegal. (Cf. *McKay*

v. *Retail Auto. S. L. Union No. 1067, supra; J. H. & S. The-atres* v. *Fay,* 260 N. Y. 315 [183 N. E. 509, 512]; *Wilner* v. *Bless, supra; Wiest* v. *Dirks, supra; Olympia Operating Co.* v. *Costello, supra;* 1 Teller, *op. cit. supra,* p. 388, et seq.; (1941) 90 U. of Pa. L. Rev. 201, 211-212; (1941) 41 Columb. L. Rev. 89, 101, n. 79-80; 116 A. L. R. 484, 497; 27 A. L. R. 651, 653.)

The basis for equity's intervention in cases such as this rests upon the fact that picketing is one of the forms of collective labor activity which seeks to exert economic pressure upon an employer. (See Restatement, Torts, § 796, et seq.) As was said in a recent opinion of the United States Supreme Court, "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation." (*Bakery and Pastry Drivers and Helpers, etc.,* v. *Wohl, supra,* p. 819, Douglas, J. concurring.) █ Such collective labor activity is permissible only when conducted according to the requirements imposed by law, and if in violation of such requirements, picketing is subject under ordinary circumstances to the restraint of a court of equity. (1 Teller, *op. cit. supra,* chap. 8, pp. 319, et seq.) The standards imposed for determining whether picketing is lawful and permissible, or unlawful and enjoinable, are matters of state law which have varied from time to time and from jurisdiction to jurisdiction. (See (1940) 39 Mich. L. Rev. 110, 111; (1941) 26 Corn. L. Q. 470, 471-472.) Thus, at various times in the past picketing has been enjoined on the theory that it is unlawful per se (*Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324]; 1 Teller, *op. cit. supra,* § 112), or on the theory that it is unlawful in the absence of a dispute between employer and employee. (See 1 Teller, *op. cit. supra,* § 117, et seq.) Neither of these criteria for determining the legality of picketing has application in California today, but violent picketing and untruthful picketing remain unlawful. (See *McKay* v. *Retail Auto. S. L. Union No. 1067, supra.*) Unless there is a statutory or constitutional restriction on the power of a court of equity under the circumstances here presented, therefore, it seems clear that plaintiff is entitled to a decree enjoining defendants from picketing falsely and untruth-

fully. (See *J. H. & S. Theatres* v. *Fay, supra; Olympia Operating Co.* v. *Costello, supra;* 1 Teller, *op. cit. supra,* p. 388, et seq.)

█ There is no anti-injunction statute which places a restraint upon the power of courts of equity in this state where labor disputes are involved. Defendants suggest, however, that the constitutional guarantee of freedom of speech constitutes a bar to the intervention of equity where untruthful picketing is involved. There is no suggestion in our cases that the provisions of the California Constitution should be so interpreted, but defendants cite certain recent decisions of the United States Supreme Court. These cases, it is true, have held that where individual states set up standards which define picketing as lawful or unlawful and where such standards are sought to be enforced by the power of equity, the state policy is subordinate to the constitutional guarantee of free speech. (*American Federation of Labor* v. *Swing, supra; Bakery and Pastry Drivers and Helpers, etc.,* v. *Wohl, supra;* see (1941) 90 U. of Pa. L. Rev. 201, 202; (1941) 29 Cal. L. Rev. 366, et seq.) Thus, where the State of Illinois sought to enjoin picketing as unlawful because there was no controversy between the employer and his employees, the state policy was overruled because it was held to constitute an unwarranted infringement of the guarantee of free speech. (*Swing* v. *American Federation of Labor,* 372 Ill. 91 [22 N. E. (2d) 857], reversed in *American Federation of Labor* v. *Swing, supra;* cf. *Miller's Inc.* v. *Journeymen Tailors Union Local No. 195* (N. J. Eq.) 15 A. (2d) 822, reversed *in Journeymen Tailors Union Local No. 195* v. *Miller's Inc.,* 312 U. S. 658 [61 S. Ct. 732, 85 L. Ed. 1106].) Similarly where the State of New York sought to enjoin picketing as unlawful in the absence of any labor dispute the state policy was reversed. (*Wohl* v. *Bakery and Pastry Drivers and Helpers, etc.,* 259 App. Div. 868 [19 N. Y. S. (2d) 811], affirmed 284 N. Y. 784, 788 (31 N. E. (2d) 765), reversed in *Bakery and Pastry Drivers and Helpers, etc.,* v. *Wohl, supra.*) In the Wohl case, *supra,* the court made it perfectly clear that the picketing involved was truthful in nature and in the Swing case, *supra,* where it was charged in the trial court that the placards were false, the Supreme Court specifically indicated that it was forced to reverse the judgment of the highest state court because that court apparently rested the injunction solely upon the absence of a dispute between the employer and his

employees. We find no suggestion in these cases, therefore, that a state policy characterizing untruthful picketing as unlawful and enjoinable is in violation of the constitutional provision. (Cf. (1940) 39 Mich. L. Rev. 110, 118; (1941) 90 U. of Pa. L. Rev. 201, 211-212.) The right to restrain the use of false or untruthful statements made in connection with picketing does not restrict the right to picket peacefully and honestly. It is a familiar doctrine of equity that the scope of the injunction will be limited to the wrongful act sought to be prevented. The effect of the decree is to protect every legitimate right of the defendants and at the same time prevent unlawful interference with the rights of plaintiffs. The policy of this state which characterizes the use of false or fraudulent statements in picketing as unlawful is within the permissible limits which a state may impose upon industrial combatants without impairing the right of free speech. (See *Thornhill* v. *Alabama*, 310 U. S. 88, 104, 105 [60 S. Ct. 736, 84 L. Ed. 1093].) Under the facts set forth in this case, therefore, plaintiffs are entitled to a decree restraining defendants from the use of false or untruthful statements in the exercise of their right to picket.

The judgment is reversed.

Shenk, J., Curtis, J., Edmonds, J., and Traynor, J., concurred.

CARTER, J., Dissenting.—I dissent.

I do not agree with the proposition that picketing in connection with a labor controversy may be enjoined if any false or untruthful statements are made or displayed on a banner used in connection with such picketing. There is no sound basis for a distinction between the publication by a newspaper of false and untrue statements, and the dissemination of such statements orally or by banners in the process of picketing. If an injunction will not lie in one case it should not in the other. If picketing may be enjoined because false statements are made, then the publication of a newspaper should be for similar reasons enjoined.

It is conceded in the majority opinion that equity will not grant injunctive relief against the publication of libel or slander. The attempted distinction between such a case and false statements in picketing cases begs the question and pursues a course of specious reasoning. It is said in the majority opinion:

"Defendants' position in this regard cannot be sustained. If defendants had remained at home and had uttered false statements concerning plaintiff, the rule cited (that libel may not be enjoined) might have been relied upon. Not so in the present case, however, for, assuming that the rule (no injunction in libel and slander cases) is correct, here *it is not the utterance of false statements which is sought to be enjoined, but the conduct of picketing in an unlawful manner.*" It then proceeds to announce that the use of false statements in picketing makes the picketing unlawful, and that unlawful picketing may be enjoined. That argument is tantamount to asserting that the unlawful act of the publication of false statements, standing alone, will not be restrained, but when that act is combined with the performance of *admittedly lawful acts,* namely, picketing, the latter will be restrained. In other words, the more inexcusable the acts of the wrongdoer, the less the punishment or restraint. If *all* of his conduct is unlawful, he goes blithely on his way immune from interference by equity, but if he combines proper and improper conduct he is amenable to the equitable processes and his lawful conduct may be restrained as well as his unlawful conduct. Furthermore, returning again to the analogy of the publication of libel by a newspaper, it might be reasoned that, under the rule stated it is not the printing of the libelous matter that may be enjoined, but the publication of a newspaper containing such matter is an unlawful business and may be enjoined. An attempt was made by the Minnesota Legislature upon that precise reasoning by the enactment of a statute authorizing the restraint of one engaging in the business of publishing a malicious, scandalous and defamatory newspaper. And although it was conceded that the newspaper was within the terms of the statute, the Supreme Court of the United States struck the statute down in no uncertain terms in *Near* v. *Minnesota,* 283 U. S. 697 [51 S. Ct. 625, 75 L. Ed. 1357]. The court would not brook any such preventive measures against the freedom of the press. Freedom of speech is no less sacred than freedom of the press and there is no reason why a newspaper should have special privileges that are not accorded to labor organizations or any other persons. An injunction is as much a preventive measure as a statute. The reasoning in the Near case is particularly applicable to the case at bar. The court there said:

" 'The statute,' said the state court, 'is *not directed at threatened libel* but at *an existing business* which, generally speaking, involves more than libel'." (Emphasis added.) Then again at page 713:

"If we cut through mere details of procedure, the operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter—in particular that the matter consists of charges against public officers of official dereliction—and unless the owner or publisher is able and disposed to bring competent evidence to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt. *This is of the essence of censorship.* (Emphasis added.)

"The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed. In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England, directed against the legislative power of the licenser, resulted in renunciation of the censorship of the press. The liberty deemed to be established was thus described by Blackstone: 'The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequences of his own temerity.' 4 Bl. Com. 151, 152; see Story on the Constitution, sections 1884, 1889. The distinction was early pointed out between the extent of the freedom with respect to censorship under our constitutional system and that enjoyed in England. Here, as Madison said, 'the great and essential rights of the people are secured against legislative as well as against executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the free-

dom of the press requires that it should be exempt not only from previous restraint by the executive, as in Great Britain, but from legislative restraint also.' Report on the Virginia Resolutions, Madison's Works, vol. IV, p. 543. This Court said, in *Patterson* v. *Colorado*, 205 U. S. 454, 462 [27 S. Ct. 556, 51 L. Ed. 879] : 'In the first place, the main purpose of such constitutional provisions is 'to prevent all such *previous restraints* upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. *Commonwealth* v. *Blanding*, 3 Pick. (Mass.) 304, 313, 314 [15 Am. Dec. 214] ; *Respublica* v. *Oswald*, 1 Dallas, 319, 325 [1 L. Ed. 155]. The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not in all. (*Commonwealth* v. *Blanding, ubi sup.;* 4 Bl. Com. 150.)

"The criticism upon Blackstone's statement has not been because immunity from previous restraint upon publication has not been regarded as deserving of special emphasis, but chiefly because that immunity cannot be deemed to exhaust the conception of the liberty guaranteed by state and Federal constitutions. The point of criticism has been 'that the mere exemption from previous restraints cannot be all that is secured by the constitutional provisions'; and that 'the liberty of the press might be rendered a mockery and a delusion, and the phrase itself a by-word, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him for harmless publications.' 2 Cooley, Const. Lim., 8th ed., p. 885. But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions. *Id.* pp. 883, 884. The law of criminal libel rests upon that secure foundation. There is also the conceded authority of courts to punish for contempt when publications directly tend to prevent the proper discharge of judicial functions. *Patterson* v. *Colorado, supra; Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 419 [38 S. Ct. 560, 62 L. Ed. 1186]. In the present case, we have no occasion to inquire as to the permissible

scope of subsequent punishment. For whatever wrong the appellant has committed or may commit, by his publications, the state appropriately affords both public and private redress by its libel laws. As has been noted, the statute in question does not deal with punishments; it provides for no punishment, except in case of contempt for violation of the court's order, but for suppression and injunction, that is, for restraint upon publication.

"The objection has also been made that the principle as to immunity from previous restraint is stated too broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. *But the limitation has been recognized only in exceptional cases:* 'When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no court could regard them as protected by any constitutional right.' (*Schenck* v. *United States,* 249 U. S. 47, 52 [39 S. Ct. 247, 63 L. Ed. 470].) No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops. On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not 'protect a man from an injunction against uttering words that may have all the effect of force. . . .' " (Emphasis added.) And again at page 720:

"*In attempted justification of the statute, it is said that it deals not with publication per se, but with the 'business' of publishing defamation.* If, however, the publisher has a constitutional right to publish, without previous restraint, an edition of his newspaper charging official derelictions, it cannot be denied that he may publish subsequent editions for the same purpose. *He does not lose his right by exercising it. If his right exists, it may be exercised in publishing nine editions, as in this case, as well as in one edition.* If previous restraint is permissible, it may be imposed at once; indeed, the wrong may be as serious in one publication as in several. *Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitu-*

*tional immunity against restraint.* Similarly, it does not matter that the newspaper or periodical is found to be 'largely' or 'chiefly' devoted to the publication of such derelictions. If the publisher has a right, without previous restraint, to publish them, his right cannot be deemed to be dependent upon his publishing something else, more or less, with the matter to which objection is made.

"Nor can it be said that the constitutional freedom from previous restraint is lost because charges are made of derelictions which constitute crimes. With the multiplying provisions of penal codes, and of municipal charters and ordinances carrying penal sanctions, the conduct of public officers is very largely within the purview of criminal statutes. The freedom of the press from previous restraint has never been regarded as limited to such animadversions as lay outside the range of penal enactments. Historically, there is no such limitation; it is inconsistent with the reason which underlies the privilege, as the privilege so limited would be of slight value for the purposes for which it came to be established." (Emphasis added.) In the case at bar the answer to the reasoning that the making of the false statements is not restrained but rather the picketing by false statements and also the reasoning that picketing when accompanied by false bannering is unlawful picketing and unlawful picketing may be enjoined, it may be said paraphrasing the language of the Supreme Court: "Characterizing the publication (the bannering of false statements) as a business (as the combination of the false bannering and picketing), and the business as a nuisance (the picketing as being enjoinable because unlawful), does not permit an invasion of the constitutional immunity against restraint."

No basis is given for the conclusion that the use of banners containing false statements makes picketing unlawful. It is merely a bald assertion of a policy which is antagonistic to picketing generally and which finds an easy method of preventing all picketing along with its correlative rights of freedom of speech, press and assembly when these rights are asserted in connection with labor disputes. If the same antagonism existed against newspapers, the same result would be reached and freedom of the press would be lost. Can it be said that under the Near case the United States Supreme Court would countenance a restraint on the distribution or

sale of a libelous newspaper or its display for sale by vendors parading before a place of business? Certainly not. Any one injured may have recourse in an action at law for damages, and the public has its penal statutes against libel. It has never been contemplated that the equity courts should act as censor bureaus with all the multitude of difficult questions arising therefrom. There is no suggestion that the unlawful utterance of false statements in picketing tends to incite breach of the peace, violence, riots and the like. And there is no reason to suppose that such tendency would be any more apt to be present in the case of picketing than in the publication and distribution of a newspaper. In either case adequate civil and criminal penalties exist. If it were proper to restrain picketing where false bannering is used, a necessary requisite would be the occurrence of acts of violence in addition to the false bannering. Under no circumstances could false bannering alone make the picketing unlawful and subject to restraint without infringing upon the right of freedom of speech. As was said by the New York Court of Appeals in *Nann* v. *Raimist,* 255 N. Y. 307 [174 N. E. 690, 694, 73 A. L. R. 669]:

"Equity does not intervene to restrain the publication of words on a mere showing of their falsity. *Marlin Firearms Co.* v. *Shields,* 171 N. Y. 384, 64 N. E. 163, 59 L. R. A. 310. It intervenes in those cases where restraint becomes essential to the preservation of a business or of other property interests threatened with *impairment by illegal combinations or by other tortious acts, the publication of the words being merely an instrument and incident. Beck* v. *Railway Teamsters' Protective Union, supra; Gompers* v. *Buck's Stove & Range Co.,* 221 U. S. 418, 431, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; *Steinert & Sons Co.* v. *Tagen,* 207 Mass. 394, 397, 93 N. E. 584, 32 L. R. A. (N. S.) 1013; *Hotel & Railroad News Co.* v. *Clark,* 243 Mass, 317, 323, 137 N. E. 534; *Allen Mfg. Co.* v. *Smith,* 224 App. Div. 187, 191, 229 N. Y. 692; Pound, Equitable Relief against Defamation, 29 Harv. L. R. 640, 666; Chafee, Cases on Equitable Relief against Defamation (2d Ed.) 1930, collating the authorities." (Emphasis added.)

It is conceded in the majority opinion that peaceful picketing is a lawful and not a tortious act. In the case at bar there was no tortious conduct of any kind, the picketing being peaceful and orderly. Therefore, there was no business or property

"threatened with impairment by illegal combinations or other tortious acts."

The reasons for which equity has refused to enjoin libel and slander are stated in 1 Teller, Labor Disputes & Collective Bargaining, p. 402:

"Two reasons have been advanced for equity's refusal to extend injunctive relief to defamation cases. The first proceeds upon the ground that libel and slander affect a personal and not a property right, and are consequently beyond the scope of equity's jurisdiction as historically understood. The second objection is *found in the principle of constitutional law guaranteeing the right to free speech. 'Principles of free government,' says Dean Pound, 'require that preventive justice be in abeyance where the wrongs complained of involve printing, publishing or writing . . . Equity has no jurisdiction as a censor of publications.'* The matter has been well expressed in *Marx Jean Clothing* v. *Watson*: 'The two ideas, the one of absolute freedom to say, write or publish whatever he will on any subject coupled with the responsibility therefor, and the other idea of preventing such free speech, free writing, or free publication, cannot co-exist'." (Emphasis added.)

.The right to picket, (publicize a labor dispute) is now squarely based upon the right of freedom of speech. (*Thornhill* v. *Alabama*, 310 U. S. 88 [60 S. Ct. 736, 84 L. Ed. 1093].) It necessarily follows therefore that the preventive measures such as injunctions, are not available where the false statements are made in the course of the picketing. All of the cases cited in the majority opinion authorizing injunctive relief were decided before the right to picket was squarely based on that constitutional guarantee or failed to consider the effect thereof. On the other hand respectable authority has held that an injunction against picketing is not proper even though false statements are made. (See *Truax* v. *Bisbee Local No. 380, Cooks & Waiters' Union*, 19 Ariz. 379 [171 Pac. 121]; *Marx & Haas Jeans Clothing Co.* v. *Watson*, 168 Mo. 133 [67 S. W. 391, 90 Am. St. Rep. 440, 56 L. R. A. 951]; *Ex parte Tucker*, 110 Tex. 335 [220 S. W. 75].) This court recognized even at a time that all picketing could be enjoined, that the making of false statements while picketing could not be restrained. It is said in *Goldberg, Bowen & Co.* v. *Stablemen's Union*, 149 Cal. 429, 434 [86 Pac. 806, 117 Am. St. Rep. 145, 9 Ann. Cas. 1219, 8 L. R. A. (N. S.) 460]:

"Some parts of the judgment seem to enjoin appellants from the mere expression of an opinion at any time or place as to plaintiff and its business, which would, at the worst, consist only of slander, *which could not be reached in this form of action,* and seem to restrain them from doing other things which do not appear to be connected with or incidental to the main acts and threatened acts done at and in front of plaintiff's said places of business as above stated." (Emphasis added.)

It is absurd to say that equity will intervene where false bannering is used in picketing because property damage, as distinguished from personal damage, is suffered. The days have long since passed when the rights of property are more sacred than personal rights. The injury suffered by a person subjected to libel or slander is in most instances far more serious and less susceptible of being repaired by monetary damages than an injury to property. If freedom of speech compels that injunction be not issued in libel and slander cases when the injury suffered is personal, then for even more forceful reasons it should not be enjoined when merely a property right is invaded.

It is stated in the majority opinion "that the trial court found that the allegations of damage in the sum of $25,000 were untrue." If that is the case then plaintiff has suffered no injury. If it has suffered no injury that alone is a sufficient basis for affirmance of the judgment denying the injunction. Certainly picketing by false statements may not be restrained where there is no showing that injury has resulted from it. Suppose the picket carried a placard upon which was inscribed "My name is John Doe" when in fact his name was Henry Jones. Although such statement would be false, it surely would not be grounds for an injunction restraining such conduct.

The record in the case at bar shows that in paragraph XV of the complaint it was alleged:

"That by reason of *all* the acts and conduct of the defendants, as hereinabove set forth, committed by them in pursuance of said illegal combination, plan, scheme and conspiracy, and as the direct and proximate result thereof, *plaintiff has suffered, and will continue to suffer, great and irreparable injury, and damage to its business and to the good will thereof,* and the right to carry on its said business and to the business and contractual relationships existing between

plaintiff and its customers and between plaintiff and its employees. That by reason of the above mentioned conduct of the defendants, the property right of plaintiff to carry on its business unmolested and the good will of plaintiff's business has been so greatly injured that plaintiff has been damaged in the sum of Twenty-five Thousand ($25,000.00) Dollars." (Emphasis added.) The court found all of those allegations untrue in the following language:

"That paragraph XV of said complaint is untrue in the absence of evidence thereunder." It is beyond question therefore that plaintiff did not suffer injury.

If no injury was or will be suffered from the false bannering then there can be no occasion for an injunction. It is stated in *Baker* v. *Retail Clerks' I. Protective Assn. etc.,* 313 Ill. App. 432 [40 N. E. (2d) 571, 574] involving an injunction in a picketing case:

"An injunction will not lie merely to prevent the commission of a tort or crime without a showing of probable irreparable injury from a continuation of the wrongful act or acts sought to be enjoined." A person may not be awarded relief without injury. The judgment of the court for defendants should be affirmed on that ground alone, even if it be assumed that as a general proposition false statements employed in picketing make it unlawful.

No sound reason is given for adopting for the first time as the rule in this state, that the right of the publisher of a newspaper to freedom of the press is more sacred than that of a labor organization to publicize its views concerning a labor dispute. But that is the effect of the majority decision.

The only possible basis for holding that picketing by untruthful bannering is unlawful, is the doctrine of fraud and deceit or libel and slander. It cannot be predicated on the former because the persons relying upon the false representations rather than the person picketed would have to be the ones to complain. If it is based on the latter, then actual damage must be proved before such statements are unlawful unless they were libelous per se.

Turning again to the authorities relied upon by the majority opinion for the proposition that untruthful picketing is unlawful picketing and may be restrained, I find that none of them gave consideration to the basic right upon which picketing rests or gave any sound reason why it was unlawful; or the statements therein are merely dictum. The state-

ment in the cases of *McKay* v. *Retail Auto. S. L. Union No. 1067*, 16 Cal. (2d) 311 [106 P. (2d) 373]; and *Steiner* v. *Long Beach Local No. 128*, 19 Cal. (2d) 676 [123 P. (2d) 20], that pickets must act honestly is dictum, and no consideration is given therein to the effect of such statement on the right of freedom of speech in relation thereto. The same is true of *Euclid Candy Co.* v. *International Longshoremen*, 49 Cal. App. (2d) 137 [121 P. (2d) 91]; *Davitt* v. *American Bakers' Union*, 124 Cal. 99 [56 Pac. 775]. The same bald statement alone is made in *Weist* v. *Dirks*, 215 Ind. 568 [20 N. E. (2d) 969]; *Wiltner* v. *Bless*, 243 N. Y. 544 [154 N. E. 598]; *Olympia Operating Co.* v. *Costello*, 278 Mass. 125 [179 N. E. 804]; and no discussion appears with reference to freedom of speech in any of these cases.

Because of my strong conviction that the preservation of the fundamental civil liberties of free speech, free press and free assembly is essential to the perpetuation of our democratic institutions, I view with alarm every encroachment against the exercise of these rights, whether such encroachment is directed against organized labor or other minority groups. If these rights can be abridged under the guise that what is said or published is false, it will just be a matter of time until freedom of expression will be curtailed in accordance with the will of the dominant group, who by providing the standard as to what constitutes truth or falsity can control publications of any character whether they be by word of mouth, placard, banner or what we now designate as a newspaper.

Furthermore, I am positively and unalterably against any form of discrimination in permitting the exercise of the fundamental personal rights guaranteed by our federal and state Constitutions. These rights are not only guaranteed to those who have sufficient power and influence to enforce their recognition, but like the air and the sunshine their beneficent attributes should be shared and enjoyed by the weak and humble and those who are struggling for their very existence.

I can see no reason whatever why publication of a false statement by a labor organization concerning the facts of a labor dispute should be subject to abatement by an injunction while a newspaper is privileged to publish false statements and be subject only to the redress afforded to those who claim that they have been libeled by such publication, namely, an action at law for damages.

In my opinion, the judgment in the case at bar should be affirmed.

Respondents' petition for a rehearing was denied July 29, 1942. Carter, J., voted for a rehearing.